THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES MEREDITH, Defendant-Appellant.

First District (4th Division)    No. 78-1070

Opinion filed May 29, 1980.—Rehearing denied June 26, 1980.

James Geis, of Geis & Geis, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Michael M. Lorge, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, James Meredith, was convicted of two counts of murder. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(1).) Defendant was sentenced to concurrent prison terms of 20 to 60 years.

On appeal, defendant contends: (1) plain error (Ill. Rev. Stat. 1975, ch. 110A, par. 615) occurred when, during closing argument, the prosecutor commented upon and urged an inference of guilt from the exercise of his sixth amendment (U.S. Const., amend. VI) right to assistance of counsel; (2) he was denied his sixth amendment (U.S. Const., amend. VI) right to effective assistance of counsel by his attorney

concealing a conflict of interest from him; and (3) reversible error occurred when a police officer's testimony, which explained the circumstances of defendant's arrest, included hearsay identifications of defendant.

We reverse and remand for new trial.

Prior to trial, an appearance was filed on defendant's behalf by attorney Dean Wolfson. During the trial and the sentencing hearing, defendant was represented by attorney Sheldon Banks. Upon completion of jury selection, defendant's attorney renewed his discovery request seeking a copy of the criminal record of Larry Ketelsen, the State's principal witness. Defense counsel told the court he did not know of any convictions against the witness, but he did know the witness had been arrested.

The assistant State's Attorney argued he had not been given any reason to suspect that the witness had a prior criminal record and, as a matter of practice, not every witness' criminal record was checked. In a discussion off the record, the witness was questioned about his alleged criminal record. The State informed the court and counsel for defendant that the witness stated he had no felony convictions.

The State also reported to the court and counsel for defendant that the witness previously had been represented by defense attorney Sheldon Banks' law firm, and thus no further discovery was warranted. The State requested that defense counsel Banks indicate on the record that no potential conflict of interest existed in his representation of defendant in the instant case. The record discloses, however, that this request was ignored by defense counsel and the court.

After opening statements, the State's first witness, Larry Ketelsen, testified that at approximately 6 p.m. on March 11, 1976, he was sitting at the rear of the bar in the Irish Pub with Bobbie Sledge and James Pinkston, the victims of the later shooting. Between 5:45 p.m. and 6:15 p.m., Ketelsen saw defendant enter the Pub with four or five people who took seats near the middle section of the bar. Defendant went behind the bar, counted the money in the cash register, and then walked towards the rear of the bar. At that point, an argument ensued between defendant and Sledge concerning money allegedly owed to Sledge. Defendant proceeded to throw beer bottles across the bar, hitting Sledge in the chest. Sledge's girlfriend, Lee Brosset, who was sitting nearby then ran into the washroom while Sledge and Pinkston backed away from the bar approximately six feet. Ketelsen further testified that he saw defendant then walk to the middle of the bar and remove a pistol from a money bag which one of defendant's companions shoved towards him. Returning to the rear of the bar, defendant then shot Sledge three times and Pinkston

twice. Immediately after the shooting, defendant and his companions left the Pub through the front door. Later in the trial, it was established that Sledge and Pinkston were dead on arrival at Illinois Masonic Hospital.

Ketelsen made an in-court identification of defendant as the man who shot Pinkston and Sledge in the Irish Pub. He also asserted he had known defendant for approximately three months prior to the shooting. Ketelsen also stated he had worked for defendant as a bartender.

On cross-examination, Ketelsen acknowledged he had known Sledge and Pinkston for six or seven years and considered them friends. Ketelsen admitted he previously had given the police a written statement which described one of defendant's friends handing a gun to defendant.

Lee Brosset testified as a State's witness. She said she saw defendant throw glasses and bottles at the victims. Brosset ran into the washroom and, while there, she heard a series of shots. She did not see who fired the shots. When she came out of the washroom she saw that defendant was no longer in the Pub. Brosset also stated defendant was not tending bar on the night of the incident.

Madeline Crowe was present in the Pub on the night of the shooting. She claimed she could not identify the person who shot Sledge and Pinkston. Crowe heard glasses breaking and saw a man, who was standing behind the bar, point a gun at another man sitting at the bar. She did not hear any argument or gunshots, but saw a man at the bar fall over. The gunman shot the gun at another man who also fell to the floor. She then saw the man who did the shooting and his companions run out of the Pub.

Officer John Toenings, called by the State, described the circumstances surrounding defendant's arrest. He was on duty as a homicide investigator for the Chicago police department when defendant entered police headquarters with his attorney, Wolfson. Toenings then arrested defendant and at that time advised him of his constitutional rights.

Officer Ted Janus testified he interviewed Madeline Crowe, Crowe's two daughters, Larry Ketelsen, Karen Filarsee, and the barmaid on duty, all of whom had been present in the Pub at the time of the shooting. Janus further stated that after completing the interviews with these people:

"[Janus]: We broadcasted a general description of the wanted offender in the case, Mr. Meredith, city-wide—over the entire City of Chicago, and also notified the police authorities in—I believe it was Lafayette, Tennessee, where we understood that Mr. Meredith may have went to.

[Defense Attorney]: Objection. Ask it be stricken and the jury told to disregard it.

[Assistant States Attorney]: I ask the Court to specify what portion of the answer is being stricken.

[The Court]: Everything after 'Lafayette' is stricken—after 'Lafayette, Tennessee'."

Defendant testified in his own behalf. He was the manager of the Pub and had authority to collect money. On March 11, 1976, at approximately 5 p.m., he entered the Pub and walked behind the bar to help the bartender since the tavern was crowded with 30 to 35 people. About 15 minutes later Pinkston and Sledge entered the Pub and walked to the rear of the bar. Later in the evening, Pinkston and Sledge got into a loud argument and defendant went to the end of the bar and asked them to "hold it down." Defendant then recognized two customers standing at the center of the bar and he approached them to take their order. As he did so he heard glass being broken and shots being fired. Without looking to see what was happening, defendant dropped the bottle he was holding, jumped over the bar and, with many of the other customers, he ran out of the Pub. He did not return to the Pub that night nor did he call the police.

Defendant further testified that the next morning, he went to another tavern where he learned that as the result of the shooting incident at the Irish Pub the evening before, two men had been killed there. He then telephoned his attorney but was unable to reach him. Later that day, after speaking with his attorney, defendant, accompanied by his attorney, surrendered to the police. On cross-examination, the defendant testified in part:

"[Assistant State's Attorney]: When did you find out you were wanted for those—

* * *

[Defendant]: The afternoon that my attorney turned me in is when I found out I was wanted for murders.

[Assistant State's Attorney]: You told the ladies and gentlemen that you called your lawyer that morning and he was in court.

[Defendant]: He was.

[Assistant State's Attorney]: So, would you tell the ladies and gentlemen of the jury why you called your lawyer before you knew that you were wanted for murder?

[Defendant]: They didn't tell me I was wanted for murder. They said I was wanted. I didn't know I was—in regards to the question of it or the murder."

William Keen and James Wiginston, friends of defendant, both testified for the defense. Their testimony was substantially the same. Together, they entered the Pub which was crowded with about 40 people. When the argument between Pinkston and Sledge started, and as the shots were fired at the rear of the bar, they were standing near the middle of the bar, facing defendant, who was beginning to pour them a drink. When the shots were fired, defendant had a bottle in his hand, not a

weapon. Keen and Wiginston along with other customers ran out of the bar immediately after the shots were fired. They did not see who did the shooting. On cross-examination, both Keen and Wiginston testified that when they learned that defendant had been arrested they did not contact the police or the State's Attorney to disclose what they saw occur at the Pub.

Officer Ted Janus was also called as a defense witness. He testified that Crowe told him she heard glasses breaking. She also told him she saw that two men had been shot, although she never saw a gun or heard any shots.

In rebuttal for the State, Brosset testified she saw defendant in the bar on the evening of the incident but she did not see him working behind the bar. Jeanne Downs, a bartender employed by the Pub, stated she was tending bar on the evening of the shooting. She could not recall defendant assisting her in her work. When Downs heard the shots, she hid behind a cooler at the other end of the bar and did not observe where defendant was standing at the time of the occurrence.

During closing argument, the prosecutor reviewed the testimony of the witnesses. He summarized certain testimony of defendant as follows:

"* * * Mr. Meredith testified that he was running the bar what did he do?

He said that he jumped over the kooler [*sic*] then he jumped over the bar and he ran out the door.

He said he heard one shot then a split second later he heard 2, 3, 4, shots and he ran out the door.

When he got out the door, he walked to his car and what did he do, * * *

* * *

He said he got in his car and he drove to his girl friends house because his pants got wet when he was sliding over the bar or whatever is a man who is allegedly running a bar and he leaves the bar.

He testified the next day that was in another bar and he learned that Bobby Sledge and Jimmie Pinkston were killed then he called his lawyer.

He then learned later that he was being charged with the murder. He called his lawyer then he was being charged with the murder.

Contrast, Meredith, Wiggins, and keeping who left when they heard firing going on with the state's witnesses were the people's witnesses the people's witnesses Ketelsen Lee Brosset, who testified they waited for the police. [*sic*]

They told their stories to the police."

Defense counsel's closing argument reviewed the substance of the arresting officer's testimony concerning defendant's surrender to the police accompanied by his lawyer. Defense counsel stated:

"Now, the State said he fled,

Mr. Meredith immediately upon the next date he didn't flee he didn't leave the jurisdiction.

He went immediately to his attorney and he surrendered himself to the police. You heard the testimony of Investigator Stone [*sic*], he said yes, he surrendered himself to me with his attorney * * * as soon as he said he knew he was charged he came in with his attorney."

During final closing argument, the prosecutor stated:

"But, if King's [*sic*] story is true he ran out before Meredith did so how would King [*sic*] know and then he says that he talked to these people and they told him about shooting and he called his lawyer but his lawyer was in court.

However, he told you that he did not know that he was going to be charged until that afternoon.

Well, I submit he knew that he had shot those people that is why he went to go call his lawyer.

In the morning and he did find out that he was going to be charged in the afternoon."

Following the jury's return of verdicts of guilty of each murder, the trial court subsequently sentenced defendant to serve concurrent prison terms of 20 to 60 years. This appeal followed.

Opinion

I

Defendant first contends that the prosecutor's closing argument, which questioned defendant's innocence because he sought the assistance of counsel, penalized defendant for exercising his sixth amendment right to counsel (U.S. Const., amend. VI). Such prosecutorial misconduct, defendant argues, constitutes plain error (Ill. Rev. Stat. 1977, ch. 110A, par. 615), necessitating reversal of his conviction and a new trial, notwithstanding the lack of a timely objection to the alleged error by counsel for defendant.

Defendant argues that when the prosecutor commented upon defendant's telephone call to his attorney the morning after the shooting incident, the prosecutor intended to raise in the minds of the jury an inference of defendant's guilt from this conduct. The crux of the claimed constitutional error is that the prosecutor's comment and its resulting

inference equate ·the exercise of a constitutional privilege with an admission of guilt, thereby penalizing defendant for the exercise of his right to counsel. We agree.

Both the Third Circuit (*United States ex rel. Macon v. Yeager* (3d Cir. 1973), 476 F.2d 613, *cert. denied* (1973), 414 U.S. 855, 38 L. Ed. 2d 104, 94 S. Ct. 154) and the Eighth Circuit (*Zemina v. Solem* (S.D. 1977), 438 F. Supp. 455, *aff'd* (8th Cir. 1978), 573 F.2d 1027) have found that such prosecutorial comment is constitutional error and is not harmless beyond a reasonable doubt. See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

The *Macon* court and the *Zemina* court analogized the sixth amendment claim presented for review to the fifth amendment claim considered in *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229. In *Griffin,* the Supreme Court held that comment on the defendant's failure to testify was forbidden by the fifth amendment, because to allow such comment would be tantamount to invoking a penalty for exercising a constitutional privilege since "[i]t cuts down on the privilege by making its assertion costly." 380 U.S. 609, 614, 14 L. Ed 2d 106, 110, 85 S. Ct. 1229, 1233.

The *Macon* court reasoned that while fundamental differences exist between the fifth and sixth amendment privileges, a prosecutor's adverse comment upon their exercise would have similar prejudicial effects. Thus, the court concluded that a prosecutor's comment upon defendant's exercise of his rights would be constitutional error where the comment was intended to penalize defendant for exercising this right by raising an adverse inference of guilt in the jurors' minds.

Likewise, the *Zemina* court, applying the *Griffin* penalty analysis, held that a defendant's sixth amendment right to counsel was violated by a prosecutor's comment to the jury that defendant's call to his lawyer was a "telling sign." We note the *Zemina* court's observations are equally applicable to the prosecutor's comments in the case at bar:

> "* * * [C]omment on a defendant's exercise of his right to counsel could make that exercise costly, especially where it was never explained to the jury that the defendant had such a right, and a cautionary instruction that no inference of guilt should be drawn from exercise of that right was not given. The prosecution should not be allowed to imply that only guilty people contact their attorneys. See *United States ex rel. Macon v. Yeager,* 476 F.2d 613, 616-17 (3rd Cir. 1973), *cert. den.* 414 U.S. 855 94 S. Ct. 154, 38 L. Ed. 2d 104 (1973) * * *." (438 F. Supp. 455, 466, *aff'd* (8th Cir. 1978), 573 F.2d 1027.)

See also *United States v. Liddy* (D.C. Cir. 1974), 509 F.2d 428, *cert.*

*denied* (1975), 420 U.S. 911, 42 L. Ed. 2d 842, 95 S. Ct. 833. (admission of request for counsel as substantive evidence of guilt raises sixth amendment problems under *Griffin*, but held to be harmless error); *United States v. Gold* (N.D. Ill. 1979), 470 F. Supp. 1336 (improper for prosecutor to comment or question exercise of constitutional right and unfair for prosecutor to urge against a person the retention of an attorney).

■■ In our opinion, the "penalty" analysis and the principles articulated in *Griffin* and applied in *Macon* and *Zemina* are applicable to the prosecutorial comment in the instant case. When the prosecutor, during closing argument, stated to the jury, "* * * He says he talked to these people * * * he called his lawyer * * * I submit he knew he had shot those people that is why he went to call his lawyer in the morning," it is clear that the prosecutor intended to raise an adverse inference of defendant's guilt in the minds of the jurors. This comment penalized defendant for consulting with his attorney and invaded a substantial right. (*People v. McCray* (1978), 60 Ill. App. 3d 487, 377 N.E.2d 46; *People v. Patterson* (1976), 44 Ill. App. 3d 894, 358 N.E.2d 1164.) In this regard, Justice Black's concurring remarks in *Grunewald v. United States* (1957), 353 U.S. 391, 425-26, 1 L. Ed. 2d 931, 955, 77 S. Ct. 936, 984-85 (J. Black concurring), are particularly noteworthy:

> "[There are] no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution."

Accordingly, we conclude that the prosecutor's comment during closing argument was prejudicial error. *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217.

The State argues that even if there was error, it was (1) waived on appeal since defendant failed to object to the error and include it in his post-trial motion; and (2) the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) On the other hand, defendant urges that we apply the plain error rule (Ill. Rev. Stat. 1977, ch. 110A, par. 615) and conclude that the error is not harmless beyond a reasonable doubt.

The "plain error" doctrine is applied to remedy errors so plain and prejudicial that failure to object to them is not treated as a waiver for purposes of appeal. We find that the error committed here was

sufficiently prejudicial so that it deprived defendant of a fair trial and was a material factor in the jury's determination of guilt. *People v. Young* (1975), 33 Ill. App. 3d 443, 337 N.E.2d 40.

We also find that the error committed here was not harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Both *Macon* and *Zemina* considered whether such error was harmless beyond a reasonable doubt and held it was not. The *Macon* court reasoned that since the facts surrounding the shooting incident were in dispute, the jury's verdict necessitated an assessment of the witnesses' credibility; thus, the comment, which was directed at defendant's credibility, could have affected the jury's verdict. Accordingly, the court concluded the error was not harmless beyond a reasonable doubt. The *Zemina* court applied the reasoning of *Macon* and quoted the following language, which we also find persuasive:

> "The prosecutor's comment concerning [defendant's] consultation with counsel the day after the shooting incident would appear to have been directed to, and may have had the effect of, raising in the jurors' minds the inference that petitioner was, or at least believed himself to be, guilty. Such an inference might certainly tend to cause the jury to disbelieve Macon's version of the story. Under these circumstances, the possibility of prejudicial impact is present and we, therefore, are unable to conclude that the prosecutor's comment was 'harmless beyond a reasonable doubt.'"

*Zemina v. Solem* (S.D. 1977), 438 F. Supp. 455, 466, *aff'd* (8th Cir. 1978), 573 F.2d 1027, citing *United States ex rel. Macon v. Yeager* (3d Cir. 1973), 476 F.2d 613, 616-17, *cert. denied* (1973), 414 U.S. 855, 38 L. Ed. 2d 104, 94 S. Ct. 154.

While it is true that if the evidence of guilt is otherwise "overwhelming," the error will be held harmless beyond a reasonable doubt (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898; *People v. Buckley* (1976), 41 Ill. App. 3d 989, 355 N.E.2d 207), we do not find the evidence here to be of such a nature. The evidence in the case at bar is not overwhelming on the issue of defendant's guilt. The evidence presented a direct conflict between the testimony of the State's witness and the testimony of defendant. The prosecution depended chiefly on the testimony of Larry Ketelsen. It was through his testimony alone that defendant was identified. Ketelsen's testimony was corroborated to some degree by the testimony of one of the victim's girlfriends; yet she was unable to identify defendant as the one who did the shooting since she did not see the shooting take place. On the other hand the defendant testified he was about to pour a drink for a customer when the shooting occurred at another place in the Pub. Defendant's version was corroborated by the testimony of King and Wiggins.

The resolution of the case, therefore, depended on the jurors' assessment of the credibility of the witnesses. We believe that the improper comments of the prosecutor might well have been a crucial factor in the juror's finding defendant guilty, since the comments were intended to raise an inference that defendant was or believed himself to be guilty. Such an inference could have caused the jury to disbelieve defendant's version of the shooting incident. (*United States ex rel. Macon v. Yeager* (3d Cir. 1973), 476 F.2d 613, *cert. denied* (1973), 414 U.S. 855, 38 L. Ed. 2d 104, 94 S. Ct. 154. See also *People v. Tate* (1978), 63 Ill. App. 3d 119, 379 N.E.2d 693; *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118.) We conclude, therefore, that under these circumstances the error here was not harmless beyond a reasonable doubt since the judgment might have been different had the prosecutor refrained from making this comment. *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217.

The State also argues the prosecutor's comment was made in response to defense counsel's closing argument and therefore was proper as invited response. We disagree. Our review of the record discloses that defendant did not invite the comment made by the prosecutor in rebuttal.

In his closing argument, the prosecutor reviewed the evidence and defendant's testimony. The prosecutor stated that defendant, "a man who is allegedly running a bar and he leaves the bar," ran out of the bar and fled to his girlfriend's home. After mentioning defendant's call to his lawyer, he urged the jurors to contrast the actions and testimony of defendant and his witnesses, who left the bar, with the testimony of the State's witnesses who waited at the bar for the police to arrive and then told their stories to the police.

In response to this characterization and description, defense counsel stated, "Now the State said he fled * * * he didn't flee he didn't leave the jurisdiction * * * He went immediately to his attorney and he surrendered himself to the police." In our opinion, the prosecutor's additional rebuttal remarks that defendant "knew that he had shot those people that is why he * * * call[ed] his lawyer," could hardly be construed as "invited response." See *People v. Jones* (1970), 47 Ill. 2d 66, 264 N.E.2d 189.

In our view, the prosecutor's closing remarks were not invited by defense counsel's closing argument. Since we believe the prosecutor's remarks deprived defendant of a fair trial and were a substantial factor in the jury's verdict, a remand for a new trial is necessary.

## II

Defendant next contends he was denied his constitutional right to effective assistance of counsel because his trial attorney, Banks, was a

member of the law firm that had previously represented Ketelsen, the State's principal witness. Defendant argues that this situation created a *per se* conflict of interest which now necessitates a reversal of his conviction since he had not been informed adequately of his attorney's affiliation, and he made no knowing and intelligent waiver of his right to effective assistance of counsel.

While our ruling on the prosecutorial misconduct issue and the remand of this case for a new trial ordinarily would obviate our consideration of this claimed error, we nevertheless must address the conflict of interest contention to a limited extent so as to avoid possible error on retrial.

■■ If on remand and retrial defendant retains for his defense the same law firm which had previously represented the State's witness (Ketelsen), it is then incumbent on the trial court, if the issue is raised, to determine whether a potential conflict of interest exists so as to preclude such representation of defendant (*People v. Fife* (1979), 76 Ill. 2d 418, 392 N.E.2d 1345; *People v. Coslet* (1977), 67 Ill. 2d 127, 364 N.E.2d 67; *People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441), or obtain a knowing waiver from him (*People v. Robinson* (1979), 79 Ill. 2d 147, 402 N.E.2d 157).

■■ As noted in *Robinson*, to obtain a knowing and intelligent waiver, the trial court must "thoroughly and carefully [inform] [defendant] of the circumstances producing the possible conflict of interest and [explain] to him the possible harm that could result * * *." *People v. Robinson* (1979), 79 Ill. 2d 147, 166, 402 N.E.2d 157.) While defendant may waive his sixth amendment right to effective assistance of counsel, nevertheless his waiver must be knowingly and intelligently made. *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.

### III

Finally, defendant contends that reversible error occurred during his trial when the court allowed police officer Ted Janus' testimony explaining the circumstances of defendant's arrest. Defendant asserts such testimony was inadmissible because it included uncorroborated hearsay identifications of defendant.

The State asserts the alleged error was not properly preserved for review in that: (1) during trial, defendant failed to object on the grounds of error he now puts forth; and (2) defendant failed to include the alleged error in his oral post-trial motion and failed to include the error in a written post-trial motion, after the State requested a written post-trial motion. Accordingly the State contends the alleged error is waived. *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227; *People v. Whitehead* (1966), 35 Ill. 2d 501, 221 N.E.2d 256.

In view of our decision to remand this case for a new trial we will address this point of alleged reversible error.

Police officer Janus, a State's witness, was examined by the prosecutor as follows:

> "Q. Now, Officer, after interviewing the individuals that you indicated you interviewed in the office what if anything did you do?
>
> A. We put our report together—so to speak.
>
> I took notes on all these interviews.
>
> Certain other officers aided in the taking of statements, and all these were incorporated in a supplementary report of our entire investigation.
>
> Q. Officer, after that what if anything did you do?
>
> A. We broadcasted a general description of the wanted offender in the case, Mr. Meredith, citywide—over the entire City of Chicago, and also notified the police authorities in—I believe it was Lafayette, Tennessee, where we understood that Mr. Meredith may have went to.
>
> Mr. Banks: Objection. Ask it be stricken and the jury told to disregard it.
>
> Mr. Dwyer: I ask the Court to specify what portion of the answer is being stricken.
>
> The Court: Everything after 'Lafayette' is stricken."

Defendant argues the clear import of this testimony was to advise the jurors that as many as six persons present at the time of the shooting identified defendant as the gunman and advised the police that defendant may have fled to Tennessee. Since only one witness identified defendant at trial, defendant asserts that this testimony had the same effect as if the officer directly testified to uncorroborated hearsay identifications. We disagree. Testimony regarding an investigatory procedure which is entirely within the knowledge of the officer who is testifying is not impermissible hearsay testimony where the officer does not testify to the substance of a conversation with a third party. *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537; *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.

Thus, in *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537, the supreme court considered a police officer's testimony in the context of its being nonadmissible hearsay evidence and found no objection on this ground. There, the officer testified he had a conversation with defendant's accomplice and then told a detective to proceed to a certain location. Similarly, in *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364, it was held that an officer may testify that he had a conversation with

a certain party and thereafter arrested defendant. The court reasoned that:

> "Officer Elam did not testify to the substance of the conversation, but merely to the fact that a conversation took place. As such, both the fact of the conversation and his subsequent conduct were within his personal knowledge and competent as testimony of the officer's investigatory procedure. McCormick, Law of Evidence (1954), §227." 17 Ill. App. 3d 421, 427, 308 N.E.2d 364, 369; see also *People v. Wedge* (1943), 383 Ill. 217, 48 N.E.2d 943; *People v. Sanders* (1976), 37 Ill. App. 3d 236, 345 N.E.2d 757.

Again in *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247, the court held that an officer's testimony that he had a conversation with someone and then proceeded to a certain location in search of defendant reflected an investigatory procedure entirely within the officer's knowledge. The testimony was not hearsay since the officer did not relate the substance of the conversation. The court further noted:

> "But even if Morely had stated that defendant was arrested on the basis of information given to him by Mrs. Sheehan, such statement would have been properly admitted for the limited purpose of showing why the officer acted as he did. *People v. Thomas* (1975), 25 Ill. App. 3d 88, 322 N.E.2d 597." 40 Ill. App. 3d 706, 709, 352 N.E.2d 247, 250. See also *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738; *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.

██ In the instant case, Officer Janus testified that after interviewing certain individuals, he made a report and broadcasted a description of defendant. The officer did not testify to the substance of any of the interviews nor the details of the description which he broadcasted. (See, *e.g.*, McCormick, Evidence §248, at 587 (2d ed. 1972).) Thus, the fact that Janus had conversations with others and subsequently acted in a certain way was within his personal knowledge and therefore could be related by him at trial. The testimony was not hearsay evidence.

The officer's statement concerning defendant's flight to Tennessee, however, properly was objected to by defendant and stricken by the court. (See, *e.g.*, *People v. Higgs* (1973), 11 Ill. App. 3d 1032, 298 N.E.2d 283.) Since defendant timely objected to the officer's statement, and the court ordered the statement stricken, we conclude that there was no prejudicial harm to defendant.

For the reasons set forth, we reverse and remand this case for a new trial.

Reversed and remanded.

JIGANTI, J., concurs.

Mr. JUSTICE JOHNSON, dissenting:

I respectfully dissent from that part of the majority opinion which concerns itself with the conflict of interest issue. For this reason, I find it imperative to submit a comment on the law governing conflicts of interest in criminal proceedings.

The Code of Professional Responsibility forbids multiple representation "if it would be likely to involve [the lawyer] in representing differing interests." ABA Code of Professional Responsibility, Disciplinary Rule 5—105(A) (1977).

Such a divergence of duty is not clearly apparent in this case. Leading conflict of interest cases involve multiple representation of defendants by a single attorney. (See *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457.) In this case, the issue is raised based upon the past representation of a key witness for the State by defense counsel. The record does not indicate the defense attorney was hampered in any way. Additionally, there was no indication of any grounds for impeachment of the witness on cross-examination. There was no present relationship between defendant's attorney and the witness nor was there a continuing relationship between the witness and the attorney's firm. If this court cannot make the determination that there was an actual divergence of interest, there was no reversible error.

It was with this reasoning that the United States Supreme Court ruled in the case of *Cuyler v. Sullivan* (May 12, 1980), 48 U.S.L.W. 4517. In *Cuyler,* a case involving multiple representation, the court stated:

> "We hold that the *possibility* of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an *actual* conflict of interest adversely affected his lawyer's performance." (Emphasis added.) 48 U.S.L.W. 4517, 4521.

Every criminal defendant has a constitutional right to the assistance of an attorney unhindered by a conflict of interest. However, henceforth, only a showing that an actual conflict of interest adversely affected performance of defense counsel will be grounds for reversible error. I would affirm the judgment of the trial court pertaining to the conflict of interest issue.