THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DANA HYCHE, Defendant-Appellant.

First District (5th Division)    No. 79-503

Opinion filed December 5, 1980.

Ralph Ruebner and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Kathleen Warnick, and Susan Ruscitti Grussel, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of attempt murder (Ill. Rev. Stat. 1975, ch. 38, par. 8—4), rape (Ill. Rev. Stat. 1975, ch. 38, par. 11—1), and aggravated kidnapping (Ill. Rev. Stat. 1975, ch. 38, pars. 10—2(a)(5), 10—2(a)(3)), and sentenced concurrently to a term of 24 years for attempt murder and rape and 10 years for aggravated kidnapping. On appeal, he contends that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State improperly cross-examined him; and (3) the State improperly bolstered its case with hearsay evidence. We affirm the trial court. The pertinent facts follow.

Prior to trial, defense motions to suppress identification and statements were denied. The State in its opening statement informed the jury that three radio broadcasts were made on the evening in question, the third of which stated, "that the man they were looking for was under a

car." An objection was sustained and the jury was instructed to disregard this remark.

Verasteen Hill, the complainant, testified that on July 18, 1977, she and her five children resided on the first floor of a two-flat building at 345 South Kilbourn. She retired around midnight and was later awakened by someone shaking her. He had a knife and threatened to cut her throat if she screamed. Hill was asked for money, wherein she indicated her purse by the bed. She was further ordered to undress, whereupon, she was raped. She stated that defendant kept his pants and undershorts on and did have an orgasm. Afterwards, defendant threw a blanket at her for cover, and told her to walk him safely out of the house. They walked through the dining room and stepped over her sleeping children. They proceeded out the front door into a small hallway illuminated by a ceiling light and a street light from across the street. Hill's dog came up the steps, at which time she turned back towards defendant and had an opportunity to view him approximately five seconds. She was ordered to proceed down the steps where he led her around through the alley by her hand. She again observed his face. Defendant still had the knife in his hand and further warned her not to scream or he would cut her throat. About three houses down the alley, Hill was ordered to go into a vacant garage. Inside the garage, defendant took the blanket and cut a piece from it. He ordered her to turn from him and face the wall while he attempted unsuccessfully to tie the piece of blanket around her mouth. At this time, she realized he was not going to let her go, and so turned and attempted to go out a side door. She made three or four steps towards the door and was stabbed in the stomach. She continued in her attempts to escape and during this time was stabbed constantly in the back, chest and both arms. At this point, they were in the gangway and she attempted to protect herself from him when he stabbed her again, puncturing her lung. Hill heard a noise that sounded like a shot or firecracker and defendant turned and ran. She stated she observed no blood on defendant during her struggle with him. She attempted to get up from where she fell on the sidewalk but fell again, whereupon she crawled to the back of the building at 4440 West Van Buren. She banged on the door and screamed for help, but no one answered. She crawled back out into the alley where she laid until a patrol car came through. She described her assailant as a male Negro, slender-built, light-skinned, small afro and wearing dark pants and no shirt. Hill was then transported to the hospital.

While in the hospital emergency room, she viewed defendant who, when he was first brought in, looked down at his feet. She indicated to Officer Frank Lameka that he looked like the man. She viewed a second man but stated he was not the one, and asked for the first suspect to be

brought back in a second time, and to say the words "If you scream I will cut your throat." She then identified defendant and further stated that he took $90 from her purse and $10 from her bra.

Officer Albert Drink next testified that at 3:30 a.m. on the evening in question, he received a radio broadcast and proceeded to the alley behind 4440 West Van Buren, where he found Hill lying nude and bleeding.

After Hill described her attacker to Drink, he then went into the garage where she had been and noticed some blood and a blanket. He also noticed blood on the back porch of 4440 and spoke to the gentleman living there. He then proceeded to a vacant lot located next to Hill's apartment and looked under the cars parked there, but found nothing. He went to her apartment, spoke with her children, and as he exited the apartment, he received a radio call. He then looked under the cars a second time and observed defendant under a green Chevrolet. Defendant was pulled out and placed under arrest. He had no shirt on and told Drink that he had been sleeping. On cross-examination, Drink testified that he did not find a knife anywhere in the area, no money was found on defendant and he did not observe blood on him.

Officer John Guida testified that he monitored a call at 3:30 a.m. on the day in question. He did not respond to the call but received a later broadcast of a woman screaming for help at the same location. He proceeded to the area and remained there for approximately 10 minutes. He then returned to routine patrol but monitored another call, and so proceeded to a vacant lot next to 345 South Kilbourn. There he observed officers with defendant in custody. He and his partner transported defendant to the hospital. En route there, defendant began beating on the wagon and shouting, "I didn't do anything." He observed Hill "wince" when she looked at defendant.

Officer Lameka testified that at 3:40 a.m. on the day in question, he proceeded to 345 South Kilbourn pursuant to a radio call. He went into Hill's apartment and talked with her children. He was notified by another officer that they had a suspect in custody. He further stated that when defendant was brought in for Hill to view, he had to be told to keep his head up as he would not look towards her. After Hill made an identification of defendant the second time he was brought in, he was transported to the station where a pair of brown shoes and purple undershorts were obtained from him. Lameka stated he went back to Hill's apartment and in the front door found her purse. The crime lab dusted the purse for prints but found none.

Rodney Block, a microanalyst for the Chicago Police Department, testified that he examined People's Exhibit No. 22, a vaginal smear slide, and found spermatozoa. He examined another People's exhibit, the

blanket, and found a number of encrustations on it, but no spermatozoa. He did however find Type A bloodstains on the blanket. Block found no significant trace materials on defendant's undershorts. He further identified People's Exhibits Nos. 16 and 17 as vials containing Type A human blood taken from the rear porch and the floor of the garage at 4440. In further testimony, he identified People's Exhibits Nos. 19 and 20 as Type A blood taken from Hill. He indicated that People's Exhibit No. 14, defendant's brown shoes, had Type A blood on the inner part of the heel on the left shoe. He could not say for certain the age of the bloodstain, nor did he know defendant's blood type.

A motion for a directed verdict was denied and People's Exhibits Nos. 1 through 31 were admitted into evidence.

## DEFENSE CASE

Defendant testified that when he left work at 9:45 p.m. on the evening in question, his boss drove him to a liquor store where he purchased a six-pack of beer. He went to his stepfather's house at 4410 West Van Buren where he drank the beer out in front by himself. His friend, Fred Powers, came by and they purchased another six-pack and drank that on the front porch of 4422 West Van Buren. They sat there approximately two hours and defendant then left when asked to do so by Powers' mother. He then walked over to his girlfriend's house and stayed there approximately one hour. He was dressed in his uniform pants but was not wearing a shirt. After he left there, he heard and saw several police cars. As he was only 17 years old at the time and had been drinking, he was concerned about being arrested for a curfew violation. He then dashed underneath a car and was subsequently pulled out by the police. He banged on the inside of the squadrol because he did not know why he had been arrested.

Defendant stated that the first time he saw Hill was at the hospital. He was asked and stated that both Hill and Lameka were mistaken when they testified that he would not look at Hill. (The defense objected but was overruled as the court felt the jury could decide how to deal with this information.) Further testimony revealed that he did not recall telling the officers that he did not know what happened until he was handcuffed, or that he had been sleeping under the car or walking down the alley when arrested by the police.

During closing arguments, the prosecutor stated that defendant was not under the car when the police first arrived. It was after Drink checked the cars, went to Hill's apartment and spoke with her children, then heard a radio message and checked the car again, that he found and arrested defendant. Defendant's motion for a new trial was denied.

OPINION

Defendant argues that he was not proven guilty beyond a reasonable doubt because he was arrested shortly after the crime and did not have any of the indicia of having committed the offenses, thus raising a reasonable doubt on the issue of identity. We are unpersuaded by this argument.

If the testimony of a witness is positive and credible it is sufficient to convict, and this is so even though such testimony is contradicted by the accused. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.) The question of identification is a matter to be determined by the jury. *People v. Tucker* (1969), 118 Ill. App. 2d 136, 255 N.E.2d 31.

Hill positively identified defendant as her attacker at the hospital and later in court. She had more than ample opportunity to view him first in the vestibule, then in the alley, in the garage and lastly in the gangway as she attempted to escape. And even as she laid nude and bleeding, she was able to accurately describe her attacker to police, which description matched defendant.

This testimony was corroborated by circumstantial evidence and several witnesses. The police officers who responded to the scene described that a police broadcast indicated shots had been fired and a later broadcast indicated a woman at the same location screaming for help. They found Hill nude and bleeding in the alley, and additionally found blood in the garage and on the back porch of 4440, and also found the blanket she said defendant threw at her to cover. The bloodstain found on defendant's shoe was the same type as that of the victim.

It is the function of the jury to weigh testimony and determine factual matters in debatable sets of circumstances (*Hairston*, 46 Ill. 2d 348, 366, 263 N.E.2d 840, 851); and a reviewing court will not substitute its judgment for that of the trial court unless the evidence is so unsatisfactory, improbable or implausible as to justify a reasonable doubt of defendant's guilt. (*Yarbrough*; *People v. Givens* (1977), 46 Ill. App. 3d 1035, 361 N.E.2d 671.) We therefore conclude that the jury was convinced beyond a reasonable doubt of defendant's guilt, and the evidence in this case supports this determination.

Defendant next argues that the State was improperly permitted to cross-examine him as to his opinion of the veracity of its witnesses.

During cross-examination of defendant, the following colloquy occurred:

"Q. When you were brought back in the second time you looked her right in the face, didn't you Mr. Hyche?

A. Yes.

Q. You didn't look down or to the side then?

A. Not that I can recall.

(Colloquy omitted)

Q. When Ms. Hill testified you didn't look her in the face, she was mistaken; is that correct?

A. Rephrase that again.

Q. Miss Hill testified you wouldn't look her in the face when you were brought into the emergency room. She was mistaken when she said that; is that right?

A. Yes.

Q. And the policeman, Investigator Lameka, he testified you wouldn't look at her. He was mistaken too?

A. That's right.

MR. CAMPION: Judge, I am going to object to this entire line of questioning. It invades the province of the jury. I would ask they be instructed to disregard the questions and answers.

THE COURT: Overruled. The jury can determine for themselves.

Q. And when Investigator Lameka said that you had first refused to say the words he told you to say, he was mistaken; is that correct?

A. That's right."

Defendant cites *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293, as controlling. In this case defendant was asked a number of times whether the testimony of other witnesses, which might have conflicted with his own, were lying. We held there that it was improper to ask a defendant's opinion concerning the veracity of other witnesses. We did not consider there whether such error was harmless, since we reversed the case on other grounds.

We agree in this instance that such questioning of defendant is improper as it clearly invades the province of the jury to determine which witnesses are telling the truth where there is conflicting testimony. However, we are not convinced such error constitutes reversible error. *People v. Meeks* (1973), 11 Ill. App. 3d 973, 297 N.E.2d 705.

■■ In *People v. Moore* (1980), 80 Ill. App. 3d 996, 400 N.E.2d 525, we considered the issue of defendant having been placed in the position of commenting on the credibility of the police officers in his cross-examination. We concluded that the prosecutor's tactics were objectionable, but in the whole context of the trial we did not think this aspect of the trial was so decisive as to require that there be a new trial. Likewise, in the case at bar, we conclude that such prosecutorial tactics are objectionable as tending to set up a confrontation between the State's witnesses and defendant; however, in light of all the evidence adduced at trial, we do not determine that such questioning was so prejudicial as to require reversal.

Defendant's last argument is that the State improperly bolstered its case with hearsay evidence which denied him his constitutional right to confront his accusers. He asserts this hearsay was of two different types: (1) conversations with persons living near the scene of the crime, and (2) police radio broadcasts, which constituted a continuing pattern in the State's case, beginning with opening statements, continuing with police officers who testified and culminating in the prosecutor's closing argument that it was only after Drink talked to Hill's children and heard a radio broadcast that he found defendant under a car. We disagree.

■■ We find no basis in the record to support defendant's first improper hearsay contention involving conversations with persons living near the scene of the crime, including Hill's children. There is no testimony regarding the contents of the conversation with the neighbor at 4440 or with Hill's children. The police officers merely related that they had talked to these persons, which was part of their investigatory duties. The fact of such conversations were within the officers' personal knowledge and thus could be related by them at trial. *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306.

■■ Defendant's second assertion with regard to the police radio broadcasts as improper hearsay evidence is also without basis. During the State's opening statement, the prosecutor commented that there was a radio call informing the police that the suspect they were looking for just went under a car. Defense's objection to this comment was sustained and the jury instructed to disregard this remark. We find that the trial court cured any possible error in the remark through its action. As our supreme court stated in *People v. Carlson* (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233, 238-39:

> "If a timely objection is made at trial, either to improper interrogation, or to an improper remark by counsel to the jury, the court can, by sustaining the objection or instructing the jury to disregard the answer or remark, usually correct the error."

Additionally, in view of the fact that the evidence against defendant is so overwhelming, as disclosed by the record, we are convinced that this remark did not influence the jury in their determination of his guilt.

■■ The officers' testimony at trial regarding the contents of the radio broadcasts was limited in the first instance to stating that a shot had been fired at the 4440 location, in the second instance to stating that a woman was screaming for help at the same location and no testimony was heard specifically concerning the contents of the third broadcast as an objection was sustained. It appears that such testimony was admitted merely to preliminarily inform the jury concerning the investigatory procedure taken by the police which brought them to the scene, and, therefore,

properly admitted for this purpose. *People v. Agee* (1980), 85 Ill. App. 3d 74, 405 N.E.2d 1245; *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306.

Defendant lastly challenges the prosecutor's closing remark as improper hearsay wherein it was stated that it was only after Drink talked to Hill's children and heard a radio broadcast that he found him under a car. This is without merit.

■■ This remark appears to be only an inference as to what the evidence showed. (*People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339.) As we stated there, "A prosecutor is allowed great latitude in closing argument." And, a trial court's determination of the propriety of the closing argument is to be upheld absent a clear abuse of discretion. *Olejniczak*, 73 Ill. App. 3d 112, 121, 390 N.E.2d 1339, 1345.

As such, defendants' reliance on *People v. Krejewski* (1928), 332 Ill. 120, 163 N.E. 438, is misplaced because it is distinguishable from the present case. The trial court there committed reversible error when it allowed a police officer to testify that a witness told him, out of defendant's presence, that he had the right men. The witness, however, was unable to identify defendants at trial. Our supreme court held that the officer's testimony was hearsay as it was not merely corroborative of the witness' testimony but was an attempt to serve as substantive evidence of defendant's identification. This did not occur in the case at bar.

We, therefore, conclude that defendant was not denied his constitutional right to confront his accusers. The record discloses that Hill positively identified defendant as her assailant, and he had the opportunity to cross-examine her at trial as well as the officers who testified. Furthermore, there was sufficient direct evidence for defendant's conviction.

Affirmed.

LORENZ and MEJDA, JJ., concur.