(No. 60826

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MILTON JOHNSON, Appellant.

*Opinion filed October 17, 1986.—Rehearing denied December 1, 1986.*

178

SIMON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Beth Katz and Gary S. Rapaport, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert and Marcia L. Friedl, Assistant Attorneys General, of

Chicago, of counsel), for the People.

CHIEF JUSTICE CLARK delivered the opinion of the court:

Following a jury trial in the circuit court of Iroquois County, the defendant, Milton Johnson, was found guilty of the murder of Anthony Hackett (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(3)) and the aggravated kidnaping (Ill. Rev. Stat. 1983, ch. 38, pars. 10—2(a)(3), (a)(5)), deviate sexual assault (Ill. Rev. Stat. 1983, ch. 38, par. 11—3), rape (Ill. Rev. Stat. 1983, ch. 38, par. 11—1(a)), and attempted murder of Patricia Gail Payne (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4(a), 9—1(a)). Defendant waived his right to a jury at the death penalty hearing. The trial court found that the necessary aggravating factors existed, and that there were no mitigating factors sufficient to preclude imposition of the death penalty. The court thereupon sentenced defendant to death for the murder of Hackett and to concurrent prison terms of 40 years for rape, deviate sexual assault, and attempted murder. The death sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603).

As a threshold matter, we consider defendant's contention that he was denied his sixth amendment right to an impartial jury drawn from a fair cross-section of the community when the trial court, in granting defendant's motion for a change of venue, moved the place of trial from Will to Iroquois County.

Prior to trial, defendant moved for a change of venue from the circuit court of Will County, citing pretrial publicity within that county as the reason necessitating the transfer. In transferring the case to Iroquois County, the trial court noted that because Iroquois County is buffered from Will and Cook counties by Kankakee County, the local and Chicago news media would least likely have

an impact in Iroquois County. The trial judge further noted that Iroquois County is one of three counties in the Twelfth Judicial Circuit over which he presided.

Thereafter, defendant filed a second motion to change the place of trial from Iroquois County to Cook County, alleging a lack of racial diversity within Iroquois County. In arguing the motion, defense counsel stated that the population of Iroquois County was 95.5% white, and that approximately 10% of Will County was black. The trial judge, in denying the motion, found that Iroquois County was the closest and most convenient forum unaffected by pretrial publicity, and stated that if it appeared during *voir dire* that an impartial jury could not be impaneled, he would reconsider the denial of defendant's motion.

Defendant initially moved for a change of venue, alleging that he could not be tried by an impartial jury drawn from a fair cross-section of the community living in Will County due to exposure to pretrial publicity. Having prevailed on his first motion for a change of venue, defendant cannot now be heard to complain that distinctive groups in Will County were not proportionately reflected on the venire in Iroquois County, which the trial court determined was the closest and most convenient forum least likely to be affected by pretrial publicity.

This is not a case involving the systematic exclusion of "a 'distinctive' group in the community" (*Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587, 99 S. Ct. 664, 668), which would trigger a fair–cross-section inquiry under the standard recently announced by the Supreme Court in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Nor are we familiar with any constitutional right allowing a defendant to select his own place of trial. (See *People v. Gacy* (1984), 103 Ill. 2d 1, 43.) To require that the venire of the transferee county proportionately mirror

any distinctive groups found in the originating county would either saddle our judiciary with an onerous, if not impossible, task or effectively grant defendants a heretofore unrecognized right to choose their place of trial.

Defendant concedes that the allowance of a motion for a change of venue lies within the sound discretion of the trial court. Indeed, our statute provides that if, upon motion, the trial court determines that a defendant cannot receive a fair trial, "it shall transfer the cause to the circuit court in *any* county where a fair trial may be had." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 38, par. 114—6(c).) Without a showing that anything but an impartial jury was impaneled in the present case, we find no basis on which to disturb the trial court's well-reasoned and proper exercise of discretion in selecting Iroquois County as the place of trial.

At trial, testimony from Patricia Gail Payne established that on July 16, 1983, she and her boyfriend, Anthony Hackett, left their homes in Emden, Illinois, and spent the afternoon and evening at Great America Amusement Park (Great America) in Gurnee, Illinois. While there, Hackett purchased a stuffed doll depicting a cartoon character popularly known as the Tasmanian Devil. Hackett placed the sales receipt for the doll in his wallet. At approximately 10 p.m., the two left Great America in Hackett's car. On their way home the pair took a wrong turn and found themselves in Chicago. After reestablishing the proper direction, Hackett and Payne drove for another 45 minutes south on Interstate 55 before they pulled off onto the shoulder of the interstate to sleep. Hackett slept on the front seat, while Payne slept on the back.

Shortly after 1:30 a.m., Payne was awakened by a tapping sound on the passenger-side window, followed by gunshots which struck Hackett and the sound of glass breaking. The passenger door was opened and Payne

was ordered to hand over Hackett's wallet, watch, and her purse. As she complied, Payne noted that the assailant was a black man wearing a light- and dark-blue flannel shirt. Payne was then ordered to get out of the car and "crawl on her belly" to a pickup truck parked approximately 10 feet away. When Payne reached the truck she was told to get inside, to stay on the floor, and to keep her eyes closed. However, Payne was able to steal quick glances of the assailant's face after he climbed into the driver's side of the pickup truck.

Once the truck was moving, Payne was directed to get on the seat. The assailant inserted his fingers in her vagina and commanded her to move back and forth. After 10 minutes Payne's assailant ordered, and then forced, her to perform oral sex. He then pulled off the interstate and stopped the truck near a white building where Payne could see many highway lights and hear voices. The assailant spoke briefly to someone and then raped Payne.

During the rape Payne was taunted by her assailant, who asked why she was crying and had she not engaged in intercourse before with her boyfriend. Her assailant then resumed driving and told Payne that it was 4:30 a.m. A short time later he again pulled off the road and stopped the pickup truck. Payne was gagged and blindfolded. Her assailant once again started to drive, only to pull off onto the shoulder of the highway after about 10 minutes. Payne was then stabbed once in the chest and she lost consciousness.

At approximately 5:30 a.m., a passing motorist found Payne in a grassy area in the median along Illinois Route 53 near Wilmington, Illinois. She was subsequently taken to St. Joseph's Hospital in Joliet, Illinois. Dr. Clyde Dawson testified that upon Payne's arrival at the hospital in the early morning hours of July 17, 1983, she had no pulse or blood pressure. Dr. Dawson per-

formed surgery to repair a stab wound to Payne's left chest and prescribed a pain killer and sleep-inducing medication, a combination of drugs which he testified would make a person "doubly drowsy."

John Meduga, special agent with the Illinois Department of Law Enforcement, testified that he met with Payne in the emergency room at 7:22 a.m., on July 17. Because of Payne's condition, she was able only to respond to Agent Meduga's questions with a simple yes or no, or a shake of her head. Payne's responses indicated that her assailant was a black male who she believed was in his mid-20s, 6 feet to 6 feet 2 inches in height, medium to heavy build with a pot belly, no observable facial hair, and a strong body odor; he was wearing a blue-plaid flannel shirt, blue jeans, low-cut gym shoes, and was armed with a shiny revolver that had a white handle. Agent Meduga also interviewed Payne at two other times later that day. At each of their three meetings, Payne stated that she would be able to recognize her assailant's low growly voice and strong body odor.

The car in which Payne and Hackett had traveled was found by police parked on the shoulder of Interstate 55. Hackett's body was on the front seat. An autopsy revealed that he had been shot five times. Two of the bullets recovered were forwarded to State evidence technicians for processing. Reddish-brown fibers were found on the floor of Hackett's car, on the grassy shoulder of the interstate near the right front passenger door, and in the grassy area adjacent to Illinois Route 53 where Payne was found by the motorist.

On July 25, 1983, eight days after the occurrence, Payne viewed approximately 1,500 photographs and picked out 42 photographs of persons with facial characteristics similar to her assailant, 34 of whom had a beard, moustache, or both. The record does not reveal whether defendant's photograph was among those Payne

viewed on July 25. On September 6, Payne looked through another group of photographs. There were 137 photographs in a single stack, including one of defendant. Payne set aside four photographs of persons having a beard, moustache or both, as having facial characteristics similar to her assailant; defendant's photograph was not among the four. At trial Payne could not recall whether she had seen defendant's photograph among those in the stack.

During the summer of 1983, the defendant lived at the home of his stepfather, Sam Myers, with his mother, Dolly Myers, and his brother, James Johnson. On September 12, 1983, defendant was questioned by special agents with the Illinois Division of Criminal Investigations regarding the use of his stepfather's black 1977 Chevrolet Scottsdale pickup truck, which was parked outside the Myers residence at that time. In mid or late September, Sam Myers brought the pickup truck to the home of Ernest Ulmer in Lockport, Illinois, to have some rust repaired and the truck repainted black. Due to illness, Ulmer was unable to work on the truck, which was stored in his garage. In either October or November 1983, and once before Christmas, Myers inquired about the truck, saying that he was in no rush for it. The truck remained in the Ulmer garage until March 9, 1984, when it was seized by police after the following developments.

The investigation into Hackett's murder and the assault, rape, and attempted murder of Payne stood at a standstill until February 28, 1984, when Ann Shoemaker telephoned the Will County sheriff's office. Shoemaker spoke with Charles Malinkowski, a Will County deputy sheriff, and informed him of an incident which occurred on July 9, 1983, that prompted her to record on a slip of paper license plate number 889930B, which belonged to the Myers pickup truck.

Over defense counsel's objection at trial, Shoemaker

testified that during the late evening hours on July 9, 1983, she and a girlfriend were walking on Bruce Road in Will County when a dark pickup truck with a cabin enclosure over the flatbed portion passed them, turned around at the corner, and passed them again. After several more such passes, the girls became frightened and returned to a party they had been at earlier. After telling everyone about the truck, Shoemaker and her friend got into Shoemaker's car and followed the truck. On cross-examination, Shoemaker explained that they wanted to find out who the driver of the truck was because they believed that he was someone they knew who was playing a joke on them.

The two followed the truck for over an hour, during which time Shoemaker wrote down the aforementioned license number along with the words "blue or black Chevy." Several times they pulled into a driveway, shut off the car lights, and waited. Each time, the truck would turn around and come back. Finally, Shoemaker testified that, at one point, they saw the truck pulled over to the side of the road under a street light with its hood up. The driver, who was standing near the passenger side of the truck, was a black man, approximately 5 feet 9 inches in height, weighed approximately 200 pounds, and was wearing what Shoemaker believed was a red-flannel shirt. The record does not indicate what Shoemaker did after she observed the driver of the truck.

Thereafter, on March 6, 1984, Shoemaker met with Deputy Malinkowski and Investigator James Fetzner of the Will County sheriff's police, and tendered to them the slip of paper bearing the license number of the Myers truck. That same day, Agent Meduga visited Payne at her home, where he showed her an array of five photographs. Of the five photographs, defendant's was the only one among those submitted to Payne on

September 6, 1983, at which time she did not identify his photograph. The record does not disclose whether any of the other four photographs were among those submitted to Payne on July 25, 1983.

After examining defendant's photograph for several minutes, Payne tentatively identified the defendant as her assailant, stating that he looked "pretty right" and adding "my gut feeling is it's him but I can't be sure— his side view looks right and his hairline seems right." Payne testified that she told Agent Meduga that she could be more certain in her identification if she heard the individual's voice.

On March 9, 1984, Payne viewed a six-person lineup at the Will County courthouse. The six participants were black males, ranging from 5 feet 8 inches to 6 feet 2 inches in height, and weighed from 180 to 250 pounds. Defendant was 5 feet 9 inches in height, and weighed 240 pounds at the time of the lineup. Because defendant had a moustache and goatee-type beard at the time and police were uncertain as to whether Payne had observed facial hair on her assailant, three other participants were included who had either a beard, moustache, or both.

Agent Meduga told Payne not to say anything until after all the participants had individually repeated the following commands her assailant had made: "Get on the ground and crawl on your belly to the truck," "Stay low," "Get in the truck," "Stay on the floor," "Keep your eyes closed," and "You got your eyes closed?" After each participant had repeated the commands, Payne positively identified the defendant's face and voice as the same face and voice of her assailant. Payne further told Agent Meduga that she had heard the participants perfectly, and when asked if she wanted to smell their body odors, Payne stated that there was no need to do so because she had no doubt that the defendant was the assailant.

On March 9, 1984, Sam Myers signed a "Consent to Search" form for police. The form authorized the search of the pickup truck parked at the Ulmer residence and indicated that Myers was voluntarily signing it with an understanding that he had a right to refuse consent. Upon locating the truck in the Ulmer garage, police had it towed to Illinois State Police Headquarters, where a search of the vehicle was conducted. Among the items found during the search were reddish-brown fibers, stains which appeared to be blood, Caucasian head hairs, and a sales receipt from Great America. Search warrants for the pickup truck and the Myers residence were issued on the basis of these items. A second search of the truck uncovered more reddish-brown fibers and a steak knife. Among the items seized from the Myers residence were three .357 magnum cartridges from the dresser top in the bedroom of Sam and Dolly Myers, a pair of size-10 low-cut gym shoes and another pair of size-11 high-cut gym shoes, both of which were found in the basement where the defendant and his brother, James Johnson, slept.

Anna Longo, training supervisor for the merchandising department at Great America, testified that the receipt recovered from the Myers truck identified the purchase on July 16, 1983, of a Tasmanian Devil doll at Great America. The doll itself had to be destroyed shortly after the Hackett vehicle was processed because it was saturated with blood and infested with insects. Longo identified a photograph of the doll as depicting the same Tasmanian Devil doll sold at Great America.

David Metzger, a forensic scientist with the Illinois Department of Law Enforcement's Bureau of Scientific Services, testified that the vast majority of fibers discovered within the Myers truck were the same as, with some being indistinguishable from, those found at the scene where Payne had been stabbed, on her clothing

and hospital bedsheet, and outside of Hackett's car. The unusual nature and multiplicity of the fiber clumps found, which appeared to Metzger to be useful only as stuffing to provide bulk to another object, strongly suggested that they had come from the same source. Metzger further testified that the knife found in the Myers truck was consistent in size with the holes in Payne's shirt, though no blood was found on the blade or on or underneath the handle, and the knife was of common size. Lastly, Metzger testified that one Caucasian head hair removed from the truck was morphologically consistent with a head-hair standard taken from Payne.

Defendant did not testify at trial. Chester Green testified for the defense that defendant had a moustache and goatee during the summer of 1983. Green also testified that he helped defendant and Sam Myers repair the exhaust system and muffler on the pickup truck in August of 1983, and that he had seen all members of the Myers family and some of their friends drive the truck.

Finally, Dolly Myers, defendant's mother, testified that the pickup truck was used by all family members and various relatives. One of the two sets of keys to the truck was kept in a kitchen drawer. Mrs. Myers stated that she and her husband were in Mississippi in the middle of July of 1983, having driven there for a two-week vacation in one of their three other cars. She testified that the muffler on the pickup truck was broken and the front windshield was badly cracked prior to the vacation. The insurance claim submitted by Sam Myers, however, indicated that the windshield was broken on July 27, 1983, at noon on Illinois Route 6 in Marseilles, Illinois. Mrs. Myers further testified that defendant had worn a moustache and goatee for the past 13 years. In addition, Mrs. Myers testified that when defendant's brother, James Johnson, was not staying with his girlfriend in Gary, Indiana, he shared a bedroom in the basement

with defendant. Mrs. Myers stated that the size-10 low-cut gym shoes found in the basement belonged to James and that defendant wore size-11 shoes—always high-top gym shoes.

Defendant contends that the evidence presented against him did not prove his guilt beyond a reasonable doubt. However, it is well established in Illinois that identification of the accused by a single eyewitness is sufficient to sustain a conviction, provided that the witness viewed the accused under circumstances permitting a positive identification. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 226; *People v. Jones* (1975), 60 Ill. 2d 300, 307-08; *People v. Stringer* (1972), 52 Ill. 2d 564, 569.

In an attempt to discredit Payne's positive identification of him, defendant calls to our attention two purported discrepancies between Payne's initial description of her assailant and defendant's actual physical appearance. First, defendant points out that Payne estimated that her assailant stood 6 feet to 6 feet 2 inches in height, whereas defendant stands 5 feet 9 inches in height. We find no substantial discrepancy here. Although her ordeal lasted approximately three hours, Payne's only opportunity to observe her assailant standing upright was when she was crawling on the ground toward the pickup truck. Obviously, such a difficult and awkward angle afforded her little, if any, occasion to accurately judge his height. It is not inconceivable that a person lying on the ground could overestimate the height of another standing nearby given the extreme visual angle involved. The fact that Payne's height estimation was off by as little as three inches, or as much as five, is insignificant under these circumstances.

Secondly, defendant argues that doubt was cast on Payne's identification because she described her assailant as having no observable facial hair, whereas defendant's mother and a family friend claimed that defendant

wore a goatee and moustache in July of 1983. The fatal flaw in this alleged discrepancy is that it, like Payne's testimony that she did not recall seeing defendant's photograph which was included among the 137 photographs tendered to her in September of 1983, simply presents a question of the credibility of the witnesses and the weight to be given their testimony. Such questions are within the province of the trier of fact, and not this court. It is well settled that "[i]t is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses." *People v. Novotny* (1968), 41 Ill. 2d 401, 412.

The sufficiency of identification evidence is a question for the jurors (*People v. Williams* (1972), 52 Ill. 2d 455, 465), and we will not substitute our judgment for theirs. A reviewing court will not set aside a conviction unless the evidence is so unsatisfactory as to raise a reasonable doubt as to the guilt of the defendant. (*People v. Ellis* (1978), 74 Ill. 2d 489, 496; *People v. Reese* (1973), 54 Ill. 2d 51, 58.) The evidence presented in the case at bar does not permit us to draw that conclusion.

Notwithstanding the fact that identification by voice alone may establish guilt beyond a reasonable doubt (see *People v. Nunn* (1981), 101 Ill. App. 3d 983, 989), defendant asserts that Payne only identified his voice at the March 9, 1984, lineup. Defendant's contention is without merit. After viewing and hearing the lineup participants repeat commands she was given during her lengthy ordeal, Payne unqualifiedly identified the defendant as her assailant. Payne testified that she recognized defendant's face as that of her assailant's at the lineup. Her identification of defendant at the in-person lineup, and again at trial, was positive, unequivocal and convinc-

ing. The record reflects that Payne had ample opportunity to observe defendant's face during her ordeal and that the lighting conditions were particularly good in the area where defendant raped Payne. In short, the jury could reasonably have believed Payne's testimony at trial and found that defendant had assaulted her and murdered Hackett.

Payne's testimony was also corroborated by overwhelming circumstantial evidence found within the Myers pickup truck, to which defendant undisputedly had access: the Great America receipt which documented the purchase of a Tasmanian Devil doll on July 16, 1983; the unusual fibers, indistinguishable from those found at the scenes where Hackett was murdered and Payne was stabbed; the head hair that was morphologically similar to the head-hair standard of Payne; and the knife which could not be eliminated as the cause of the stab holes made in Payne's shirt.

Defendant argues that the trial court erred in denying his pretrial motion to suppress evidence seized in the search of the truck. However, we agree with the trial court that defendant did not have standing to contest the search and seizure of the truck.

The fourth amendment protection against unreasonable government search and seizure extends only to individuals who have a reasonable expectation of privacy in the place searched or property seized. (*Rakas v. Illinois* (1978), 439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430.) Property ownership, while not dispositive, is a factor to be considered in determining whether an individual has standing to test the constitutionality of a search and seizure. (*United States v. Salvucci* (1980), 448 U.S. 83, 91, 65 L. Ed. 2d 619, 628, 100 S. Ct. 2547, 2553.) Other factors relevant in determining whether a reasonable privacy expectation exists, include whether defendant was legitimately present in the area searched;

his possessory interest in the area or property seized; prior use of the area searched or property seized; ability to control or exclude others' use of the property; and a subjective expectation of privacy in the property. See *United States v. Lochan* (1st Cir. 1982), 674 F.2d 960, 965; *People v. Flowers* (1982), 111 Ill. App. 3d 348, 353.

Guided by the foregoing factors, we conclude that defendant failed to carry his burden of establishing that he held a reasonable expectation of privacy in the pickup truck at the time it was searched and seized. The fact that defendant had driven the truck six months prior to its seizure is insufficient in view of the lack of any other evidence of a reasonable privacy expectation. The question whether a defendant has a reasonable expectation of privacy in the area searched or the items seized must be resolved in view of the totality of the circumstances of the particular case. *People v. Becktel* (1985), 137 Ill. App. 3d 810, 815.

The record does not support defendant's contention that he had "continuous use and right of access" to the truck, which was owned by his stepfather, Sam Myers. Although defendant did use the truck prior to September 1983, the record shows that defendant had no contact whatsoever with the truck during the next six months prior to its seizure. Defendant was not present at, or in possession of, the truck when it was seized at the Ulmer residence in March 1984. More importantly, defendant did not establish that his presence in, or possession of, the truck while it was stored in the Ulmer garage would have been legitimate. Thus, defendant has plainly failed to show that he had a right of access to the truck at the time it was searched and seized.

Finally, defendant did not claim any property interest in the items seized and failed to establish that he had ever stored any personal effects in the truck or otherwise maintained a subjective expectation of privacy in its

contents. Since we hold defendant lacked standing to contest the search and seizure of the truck, we need not consider the effect that Mr. Myers' written consent to search the truck had upon the subsequent police search and seizure of the vehicle. The trial judge correctly denied defendant's motion to suppress evidence seized from the truck.

We also reject defendant's contention that the trial court erred in denying his motion *in limine* to bar the testimony of Ann Shoemaker on the ground of relevancy. "The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse." (*People v. Ward* (1984), 101 Ill. 2d 443, 455-56.) We cannot say that the trial court abused its discretion in admitting Shoemaker's testimony.

Relevant evidence is that having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without such evidence. (*People v. Free* (1983), 94 Ill. 2d 378, 413, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200; *People v. Monroe* (1977), 66 Ill. 2d 317, 322.) Defendant argues that Shoemaker's testimony was not relevant because it did not implicate him as the driver of the Myers truck on July 9, 1983. We disagree. Shoemaker's physical description of the driver closely fit defendant. The fair inference that defendant was the driver was not rebutted by evidence that anyone else in the Myers family or their friends had driven the truck that evening. Proof that defendant had access to the truck during the late-night weekend hours, as in the Shoemaker incident, was certainly relevant in establishing his identity, only eight days later, as the individual who murdered Hackett and assaulted Payne during the early Sunday morning hours on July 17, 1983.

Shoemaker's testimony was also relevant in explaining to the jury the reason why Payne was shown a photograph of defendant on March 6, 1984, despite her failure to identify him from the group of photographs shown to her six months earlier. The consequential steps in the investigation of a crime are relevant when necessary and important to a full explanation of the State's case to the trier of fact. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 534; *People v. Byrd* (1976), 43 Ill. App. 3d 735, 742.) In opening statement and again in closing argument, defense counsel suggested that police had unjustifiably targeted defendant eight months after the offenses by conducting the March 6 photographic lineup and the subsequent in-person lineup. Shoemaker's testimony, therefore, was relevant to rebut this suggestion.

We believe that it was necessary and important for the jury to know the basis—Shoemaker's testimony—for what would otherwise be an unexplained and arguably suggestive police procedure employed in securing defendant's identification. As the court in *People v. Byrd* (1976), 43 Ill. App. 3d 735, 742, stated:

> "The State must be permitted to make some explanation why a previously unidentified defendant was arrested and shown to the victim of a crime. If this were not permitted defense counsel could play upon it in argument, asking why the defendant—of all the men in the world—was on trial, insinuating that the accused was arrested without reason."

Finally, inasmuch as defendant concedes that Shoemaker's testimony did not establish any criminal activity, we conclude that its probative value clearly outweighed the prejudicial effect, if any, that it may have had.

Defendant also contends that the trial court erred in allowing Roger Peele, special agent with the Federal Bureau of Investigation, to testify to the results of a neutron-activation analysis he conducted on the cartridges

found in the defendant's home and the bullets recovered from the victim. Defendant argues that the results of Agent Peele's analysis were inconclusive and irrelevant, and that he was therefore denied his right to a fair trial by its admission. Because the admissibility of neutron-activation-analysis results has never before been challenged in the reviewing courts of our State, a brief explanation of its operation and application, within the context of this case, is in order.

As Agent Peele explained at trial, neutron-activation analysis is a two-phase method of instrumental chemical analysis, which detects, in parts per million, trace elements in a sample of material for the purpose of identifying the source of the material. In the case at hand, sample pieces were first cut from each bullet. In the energy-activation phase, the samples were placed separately in a nuclear reactor, bombarded with neutrons, and thereby made radioactive. In the energy-detection phase, each radioactive sample was removed from the reactor and the presence and quantity of any trace amounts of antimony, copper, and arsenic in the bullet lead were determined by measuring the number of gamma rays and the associated energy emitted. The manufacturer, Agent Peele explained, specifies the quantity of antimony that is added to its lead for hardening purposes. Copper and arsenic, on the other hand, are used in the manufacturing process, but the amounts present are random, not specified. Therefore, boxes of cartridges manufactured on or about the same day will contain a unique quantity of these trace elements. By comparing the trace-element composition of the samples, Agent Peele was able to form an opinion as to whether the bullets found at the scene of the Hackett murder and in defendant's home would commonly be found within the same box of cartridges or from another box of the same type and manufacture-packaged on or about the

same day.

The record belies defendant's assertion that the neutron-activation-analysis results were inconclusive or, at best, only supported a conclusion that the bullets tested were possibly manufactured on the same day. While Agent Peele testified that the absence of arsenic in the samples prevented him from ultimately designating a match, he stated that the fact that arsenic was not detected in any of the samples nevertheless provided a significant correlation among them. Based upon the very close copper and antimony compositions of the bullets from the scene of the Hackett murder and the defendant's residence, Agent Peele concluded that the samples "would commonly be expected to be found among bullets within the same box of cartridges with compositions just like these, and that [*i.e.*, another box of cartridges close in composition] could best be found from the same type and manufacture packaged on the same day." We find that Agent Peele's testimony, while not conclusive, clearly imports more than a possibility of common origin.

Defendant cites *State v. Holt* (1969), 17 Ohio St. 2d 81, 246 N.E.2d 365, for the proposition that expert opinions expressing less certitude than a "probability" or an "actuality" in interpreting the results of a neutron-activation analysis are incompetent. In that case, the Ohio Supreme Court stated that it was adopting the above standard "since Neutron Activation Analysis has not yet reached the point of generally proven reliability, and since the testing procedures followed by the witness herein are subject to challenge." (17 Ohio St. 2d 81, 85, 246 N.E.2d 365, 367.) Far from being the "leading case" on the subject, as defendant suggests *Holt* is, our research indicates that no other jurisdiction has adopted its rationale in excluding the results of a neutron-activation analysis.

We view the persuasiveness of *Holt* as limited to the

temporal context in which the decision was rendered. When *Holt* was decided the Ohio court was correct in observing that neutron-activation analysis was a relatively new and untested forensic-science technique. Since *Holt*, however, neutron-activation analysis has come to be accepted as a consistently reliable forensic-science technique, with a majority of jurisdictions holding that the results of such tests are admissible in criminal proceedings. (*E.g.*, *Chatom v. State* (Ala. 1977), 348 So. 2d 838; *Keith v. State* (Alaska 1980), 612 P.2d 977; *Mills v. State* (Fla. 1985), 476 So. 2d 172; *State v. Warden* (1979), 100 Idaho 21, 592 P.2d 836; *State v. Ulrich* (1980), 187 Mont. 347, 609 P.2d 1218; *State v. Journey* (1978), 201 Neb. 607, 271 N.W.2d 320; *Commonwealth v. Sangricco* (1977), 475 Pa. 179, 379 A.2d 1342.) We are persuaded by the reasoning of those courts in so doing and likewise believe that any lack of certitude in a qualified expert's testimony, or inconclusiveness in the results of an otherwise reliable neutron-activation analysis, goes to the weight and not the admissibility of such evidence. *Mills v. State* (Fla. 1985), 476 So. 2d 172, 176-77; *Jones v. State* (Ind. 1981), 425 N.E.2d 128, 131; *State v. Spencer* (1974), 298 Minn. 456, 460, 216 N.W.2d 131, 134; *cf. County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 18 (medical testimony that conditions of employment "could have" or "might have" resulted in injury properly admitted despite objection that testimony was inconclusive and speculative); *People v. Columbo* (1983), 118 Ill. App. 3d 882, 962 (microscopic analysis establishing a "possibility" that two hairs came from same source properly admitted).

Finally, we are not persuaded by defendant's conclusory assertion that the results of the neutron-activation analysis were irrelevant. As stated earlier, evidence is relevant if it has any tendency to make the existence of any material fact more probable or less probable than it

would be without such evidence. (*People v. Free* (1983), 94 Ill. 2d 378, 415, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.) Clearly the test results were relevant in establishing, as more probable, the material fact that the bullets from the Hackett murder were from the same box as the cartridges found in defendant's home. The trial court did not abuse its discretion in allowing this evidence.

Defendant next urges that his convictions should be reversed because the prosecutor made various comments during closing argument which allegedly denied him his right to a fair trial. We observe that the vast majority of the remarks complained of were not objected to at trial or raised in defendant's post-trial motion and are therefore waived unless it is "plainly apparent that an error is so prejudicial that real justice has been denied or that the verdict of the jury may have resulted from the error." (*People v. Yates* (1983), 98 Ill. 2d 502, 533.) Upon review of the record, we cannot say that the unobjected-to remarks were of such a nature that either standard was violated.

Although opinions made by a prosecutor during closing argument are generally improper, this court has consistently recognized an exception where the comment was based on the evidence. (*E.g.*, *People v. Adams* (1985), 109 Ill. 2d 102, 118; *People v. Holman* (1984), 103 Ill. 2d 133, 172-73.) With one exception, all of the unobjected-to prosecutorial comments were properly based upon the evidence presented or a reasonable inference drawn therefrom. The prosecutor's one comment expressing an opinion on a matter not relating to the evidence came when he stated:

> "Some may call it fate, I'd like to call it a miracle. Gail's life was spared. *** In my opinion the reason for that is so that she could have the opportunity some day down the road to sit upon a witness stand in some court in this

land and finger the person, finger that black man that slaughtered her boyfriend."

Defendant does not argue that this comment prejudiced him beyond the fact that it was an improper expression of personal opinion, and on this record, we will not conjecture otherwise. However, we find unnecessary and potentially offensive the prosecutor's reference to defendant as "that black man," even though defendant does not contend that the remark was intended to incite racial prejudice among the all-white jury or that it had that effect. We also consider the prosecutor's comment on why he thought Payne had survived her assault to be pure philosophical musing. Although we consider the remark intemperate and improper, the record indicates that the jury was instructed to consider only the evidence at trial and to disregard any statements made in closing argument that were not based on the evidence. We note further that the remark, which was not objected to by defendant, was isolated and the prosecutor did not dwell on it any further. In view of the entire record and the overwhelming evidence of defendant's guilt, we cannot say that the improper comment either constituted a material factor in defendant's convictions or otherwise prevented him from receiving a fair trial so as to require reversal.

Defendant also complains that the prosecutor improperly suggested that defendant's mother, Dolly Myers, was lying when she testified that the windshield of the pickup truck was broken before she and her husband went on vacation in the middle of July of 1983. Over objection, the prosecutor stated further that there was no way to verify Mrs. Myers' testimony. This court has held that a prosecutor's statement that a witness was lying is not improper if it is based on the evidence. (*People v. Adams* (1985), 109 Ill. 2d 102, 118; *People v. Tiller* (1982), 94 Ill. 2d 303, 318-19.) Here, Mrs. Myers' testi-

mony was in direct conflict with the insurance claim form the State later introduced, which stated that the windshield was broken on July 27, 1983, 10 days after Payne's assault. Just as defense counsel was entitled to argue that Mrs. Myers had simply been mistaken in her testimony, the State was likewise entitled to argue on the evidence that she was lying. We find nothing improper in the prosecutor's comments.

The defendant also claims that further error occurred in the State's rebuttal closing argument when the prosecutor told the jury, "You are going to have to decide in this case members of the jury who is telling the truth." We cannot agree. It is not open to question that the jury, as trier of fact, bears the "responsibility to judge the credibility of the witnesses and to ascertain the truth." (*People v. Yates* (1983), 98 Ill. 2d 502, 525.) Further, defendant's assertion that the prosecutor informed the jury that it would have to adjudge Payne a liar "in order to acquit Mr. Johnson" finds no support in the record.

In closing argument defense counsel implied that Agent Meduga, as the major force in a police conspiracy against defendant, employed suggestive police procedures to prompt Payne's tentative identification of defendant's photograph on March 6, 1984. Defense counsel then portrayed Agent Meduga as acting on his own belief in defendant's guilt by unjustifiably conducting the subsequent in-person lineup in which Payne positively identified defendant. It was in this context that the prosecutor responded:

> "You have got to say Gail is a liar, you have got to say that she is part of the police conspiracy. [Defense counsel] says we don't know what Meduga said on the 6th, we don't know what he suggested to her. She testified. She would have to be lying about what happened March 6th if Meduga suggested or did anything improper."

It is quite clear that the prosecutor did not state that

defendant could not be acquitted unless the jury found that Payne was lying. Rather, the prosecutor simply argued that, before the jury could accept defense counsel's factual assertion that Agent Meduga engineered suggestive photographic and in-person lineups, they would first have to disbelieve Payne's testimony. Payne testified that it was she who asked Agent Meduga for an opportunity to make a voice identification, and there was no evidence whatsoever that Agent Meduga had said anything improper to focus Payne's attention on defendant. By suggesting the existence of a police conspiracy, defense counsel invited this rebuttal, and it thus was neither improper nor prejudicial.

The defendant also complains that the prosecutor, over objection, urged the jury to accept, as fact, several unfounded assertions when he explained:

> "We don't have the gym shoes because he got rid of the gym shoes, and we don't have the gun because he got rid of the gun, and we don't have the wallet because he got rid of the wallet, we don't have the purse because he got rid of the purse and he thought he had the truck out of commission because it was going to be painted \*\*\* but he didn't know the fibers and didn't know \*\*\* the receipt was in there. Where was the truck for eight months \*\*\*? It was locked up in a garage."

We believe that the prosecutor's comments were fair inferences based on the evidence. The evidence establishing defendant's guilt was overwhelming, and it was therefore a fair inference that the above missing items associated with the offense were not recovered because defendant had disposed of them. Moreover, the remarks were an invited response to defense counsel's suggestion that, considering the exhaustive investigation by authorities, it was incredible "not one iota" of physical evidence connecting defendant to the crimes was discovered until the Myers truck was searched eight months later.

Having determined that no reversible error occurred during the guilt phase of defendant's trial, we affirm defendant's convictions on all charges and next address his allegations of error at the sentencing hearing.

We first note that the affirmation of defendant's convictions disposes of his contention that his conviction for felony murder based on the armed robbery of Hackett was supported by insufficient evidence and therefore could not form the basis for the statutory aggravating factor which triggered his eligibility for the death penalty. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6).) Further, insofar as this conviction provided the necessary statutory aggravating factor, we need not consider defendant's ancillary contention that his convictions for the felonies committed against Payne should not be construed to support statutory aggravating factors under section 9—1(b)(6) because they were not perpetrated against the murder victim.

The sentencing hearing was held before the trial judge, the defendant having waived his right to a jury and, against advice of counsel and over the State's objection, exercised his right not to be present during the course of the proceeding. At the hearing and over objection, the State presented evidence of a multiple homicide which occurred in Homer Township during the early morning hours of July 16, 1983. Defendant contends that the evidence presented was irrelevant because the homicides occurred in a different area and prior to the offenses for which he stands convicted and because the evidence did not sufficiently connect him to their commission. The State argues that defendant did not allege in his post-trial motion any error arising from his sentencing hearing, and thus any claim of error in this regard is waived. (*People v. Szabo* (1986), 113 Ill. 2d 83, 93; *People v. Wright* (1985), 111 Ill. 2d 128, 148; *People v. King* (1986), 109 Ill. 2d 514, 533.) Without ruling on

the waiver question, defendant's contention is without merit.

During the early morning hours of July 16, 1983, the day preceding the Hackett-Payne incident, four people were shot to death and two others wounded in the vicinity of 147th Street and Gauger Road in Homer Township. Property from the victims was recovered 15 miles from defendant's residence and eight miles from the scene of Hackett's murder.

In his reply brief, defendant concedes that evidence connected the Myers truck to the Homer Township homicides: a dark-colored Ford or Chevy pickup truck with a cabin over the flatbed portion was seen traveling east on 143rd Street at a very high rate of speed at approximately 3:45 a.m., minutes after the shootings. In addition, defendant does not contest that, despite the weather being hot and humid at the time, a dry and unfaded receipt made out to Sam Myers, and last seen by him on the truck's dashboard, was discovered at the scene under the body of Will County sheriff's auxiliary deputy Steven Mayer. Notwithstanding, defendant maintains that "no evidence" connects him to the homicides. We cannot agree.

James Fetzner, investigator with the Will County sheriff's police, testified that he met with Will County sheriff's auxiliary deputy Dennis Foley five or six times following the Homer Township shootings. Deputy Foley, who was hospitalized for serious gunshot wounds, died 32 days after the shootings. During their meetings, Deputy Foley stated that as he and Deputy Mayer approached 147th Street and Gauger Road they observed a brown van partially blocking the roadway nose to nose with a red car. (Later discovered in the two vehicles, a red Chevrolet Chevette and brown Chevrolet Suburban, were the bodies of three of the victims.) A black man walked from behind the driver's side of the van and said

that he needed a "jump." The man then pulled a handgun and shot both deputies. He next took their guns and wallets. Deputy Foley noted that his assailant was wearing a flannel shirt and blue jeans. He also stated that the assailant was approximately 6 feet in height, weighed over 200 pounds, and was clean-shaven.

Officer Fetzner also interviewed Laura Troutman, who was a passenger in the brown Chevy Suburban driven by George Kiehl. Troutman told Officer Fetzner that she and Kiehl were traveling westbound on 147th Street when they observed a medium-blue pickup pulled partially into a field entrance facing a red Chevrolet Chevette. A white man was standing next to the driver's door with his arm on top of the car and his head down, as though he were talking to someone inside the car.

Troutman and Kiehl drove down to 151st Street, turned around and came back. On the return trip, Troutman could see red lights of a squad car flashing, and she thought she saw someone duck between the vehicles. As they neared the pickup truck, a white man; who Troutman thought was a police officer, called to them, "Stop. Wait, wait." When Kiehl slowed the vehicle and rolled down his window, shots were fired. Troutman told Officer Fetzner that she thought she had been shot by the police officer. However, Troutman also told Will County Sheriff's Deputy Charles Malinowski that a photograph of Deputy Mayer, who was found dead at the scene, looked "very similar" in physical appearance to that of the police officer she had seen in front of their vehicle before she was shot.

Stipulated ballistics evidence indicated that Anthony Hackett and Deputy Mayer were both shot with a .38 or .357 weapon creating rifling characteristics of six lands and six grooves to the left. Also, neutron-activation analysis of bullets recovered from their bodies and the .357 cartridges found in defendant's home were of a close

compositional association, such that they would commonly be found among bullets from the same box of cartridges or different boxes of cartridges of the same type and manufacture-packaged on or about the same date. It was further stipulated that shoeprints consistent with Converse Brand All-Star gym shoes were found near the Chevette and the squad car.

The admissibility of evidence at the aggravation and mitigation phases of the sentencing hearing is not governed by the restrictive rules of evidence in effect at the guilt phase of the trial. (*People v. Free* (1983), 94 Ill. 2d 378, 426-27, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200; Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e).) The broadened standard governing admissibility of evidence allows the State and the defendant considerable leeway in presenting evidence so long as the proffered evidence is relevant and reliable (*People v. Owens* (1984), 102 Ill. 2d 88, 111, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362), as determined by the trial court in its sound discretion (*People v. Perez* (1985), 108 Ill. 2d 70, 88). Proof of prior misconduct not resulting in prosecution or conviction is admissible as relevant to the question of defendant's character. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 365.) When a sentencing hearing is conducted by a trial judge acting without a jury, "the trial judge is presumed to consider only competent and relevant evidence in determining sentence." *People v. Morgan* (1986), 112 Ill. 2d 111, 144.

In light of these principles and given the nature of Officer Fetzner's testimony, as well as the strong circumstantial evidence presented, we cannot find that the trial judge abused his discretion in admitting evidence of defendant's involvement in the Homer Township homicides as relevant to the sentencing phase of defendant's trial. The Homer Township incident occurred less than 24 hours before defendant murdered Hackett and almost

succeeded in murdering Payne. Significantly, Payne told police that her assailant was a black male, medium to heavy build, wearing a flannel shirt, blue jeans, and gym shoes, while Deputy Foley also told Officer Fetzner that his assailant was a black male who weighed over 200 pounds, and wore a flannel shirt and blue jeans. Moreover, shoeprints consistent with Converse Brand All-Star gym shoes were discovered at the scene. Given the fact that the accuracy of this evidence was never directly challenged, the trial court did not abuse its discretion in finding the evidence reliable. The trial court was aware that defendant had yet to be charged in the Homer Township slayings and was able to consider that fact in weighing the aggravation value of the evidence.

Defendant next argues that he involuntarily and unknowingly waived his sixth amendment right to assistance of counsel because the trial court, in accepting defendant's decision not to call witnesses in mitigation, did not inform him that without affirmative presentation of mitigating evidence defendant was subjecting himself to a mandatory imposition of the death penalty. Following the State's case in aggravation, defense counsel informed the trial court that defendant remained steadfast in his wish, adamantly expressed before and during the sentencing hearing, to waive his right to have counsel present mitigating evidence. Counsel had intended to call a minister and defendant's parents. We note that defendant did not raise this issue in his post-trial motion. Accordingly, any claim of error regarding it is deemed waived. *People v. Szabo* (1986), 113 Ill. 2d 83, 93; *People v. Wright* (1985), 111 Ill. 2d 128, 148; *People v. King* (1986), 109 Ill. 2d 514, 533.

Moreover, even if it had not been waived, defendant's argument would fail, since it rests upon the erroneous legal premise that the death penalty *must* be imposed where a capital defendant waives his right to have coun-

sel present mitigating evidence. Neither our death penalty statute nor the decisions of this court permit the automatic imposition of the death penalty, or likewise allow for an admonishment to a defendant that such a result shall obtain, where a capital defendant waives presentation of mitigating evidence. Suffice it to say that, while a defendant shall be sentenced to death if there are no mitigating factors sufficient to preclude imposition of the death penalty (Ill. Rev. Stat. 1983, ch. 38, pars. 9—(1)(g), (h)), mitigation may be found in the evidence adduced at trial as well as any evidence introduced at the sentencing hearing. *People v. Gacy* (1984), 103 Ill. 2d 1, 100; *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307; *People v. Carlson* (1980), 79 Ill. 2d 564, 589-90.

We next address defendant's argument that qualification of the jury pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, denied him his right to a jury drawn from a fair cross-section of the community and resulted in a conviction-prone jury. The Supreme Court has recently rejected in *Lockhart v. McCree* (1986), 476 U.S. 169, 90 L. Ed. 2d 137, 106 S. Ct. 1758, a challenge to the qualification of jurors under *Witherspoon* on precisely the same grounds as defendant now raises. Our decisions are in harmony with *Lockhart* and therefore need not be reconsidered. The qualification of jurors under *Witherspoon* does not deny a defendant the right to a jury drawn from a fair cross-section of the community (*People v. Neal* (1985), 111 Ill. 2d 180, 197; *People v. Gacy* (1984), 103 Ill. 2d 1, 37-38; *People v. Silagy* (1984), 101 Ill. 2d 147, 165), nor does it result in a conviction-prone jury (*People v. Neal* (1985), 111 Ill. 2d 180, 197; *People v. Collins* (1985), 106 Ill. 2d 237, 279; *People v. Gacy* (1984), 103 Ill. 2d 1, 37-38).

Defendant also raises three issues alleging that the Il-

linois death penalty statute is unconstitutional. All of defendant's contentions have been previously considered and rejected by this court. This court has rejected the contention that the imposition of the death penalty is arbitrarily limited to individuals who do not require special provisions or assistance to understand the proceeding or assist in their defense. (*People v. Neal* (1985), 111 Ill. 2d 180, 202; *People v. Madej* (1985), 106 Ill. 2d 201, 212; *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368.) It has also rejected the contention that the death penalty statute fails to adequately narrow the group of persons eligible for death from others guilty of murder. (*People v. Olinger* (1986), 112 Ill. 2d 324, 352; see also *People v. Williams* (1983), 97 Ill. 2d 252, 266; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44.) Finally, this court has rejected the contention that the death penalty statute does not contain adequate safeguards to prevent the arbitrary or capricious imposition of death sentences. (*People v. Morgan* (1986), 112 Ill. 2d 111, 148; *People v. Neal* (1985), 111 Ill. 2d 180, 202-03; *People v. Albanese* (1984), 104 Ill. 2d 504, 539-42.) Defendant offers no persuasive arguments for reconsideration of these issues, and we therefore decline to do so.

For the reasons stated herein, the judgment of the circuit court of Iroquois County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 27, 1987, as the date on which the sentence of death entered in the circuit court of Iroquois County is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of

the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the majority's decision to uphold the conviction. However, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that the death sentence in this case should be vacated.