THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DAVID BYRD, Defendant-Appellant.

First District (3rd Division)    No. 62330

Opinion filed November 4, 1976.

736

James Geis and Brenda E. Richey, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J..Bolon, James S. Veldman, and William F. Ward, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

Gus Jones, Nancy Smith and the defendant, David Byrd were indicted for the murder of Alice Latimore and for the attempt murder and armed robbery of her father, Clarence Latimore. Byrd obtained a severance from the other defendants. He was tried by a jury, found guilty and was sentenced to concurrent terms of 100 to 300 years for the offense of murder, 5 to 15 years for the attempt murder and 25 to 50 years for the armed robbery.

Three points are argued on appeal, that he was not proved guilty beyond a reasonable doubt, that error was committed in permitting the testimony of police officers concerning their investigatory procedures which led to Byrd's arrest, and that a photograph of Byrd was improperly admitted into evidence and taken to the jury room.

Clarence Latimore lived on the far south side of Chicago with his common-law wife, Nancy Smith. His daughter, Alice Latimore, one of three children born to him by his divorced wife, was visiting at his home on July 25, 1971. Latimore, who owned four liquor stores, returned home that night about 10 p.m., put his auto in the garage and tried to enter his house. The door was locked and Nancy Smith opened it. As Latimore stepped inside the unlighted hallway, Gus Jones, a former employee of his, put a gun to his head, hit him on the side of the head with it and said, "This is a stick-up." Jones was joined by another man with a gun, a stranger to Latimore, whom he later identified as the defendant David Byrd. They escorted Latimore into a bedroom. When they turned on the light he saw his daughter seated on a bed with her feet bound together and her hands tied behind her back. Jones again slapped him on the head with a pistol and told Smith to get something to tie him up. She returned with a clothesline and a bathrobe belt. Jones tied his hands behind him, had him lie down with his face to the floor, bound his feet and instructed Byrd to kill him if he moved. Byrd sat on the floor, spread his legs and put Latimore's head between them. Latimore raised his head and looked up at him twice and both times Byrd struck him with his gun. Jones took his watch and his rings and then turned him face upward and took $700 from his pocket. They had been in the bedroom about an hour when Jones cut the bonds on his feet and his daughter's and with Smith and Byrd escorted them to the garage.

Latimore owned two Cadillacs, one was green and the other was brownish gold. He was compelled to lie face down on the rear floor of the

green Cadillac and Alice was made to sit on the rear seat. The three abductors got in the front seat. Jones tried to back the car out of the garage but he had difficulty and he told Smith to take over. After she backed the green car out, Jones got into the gold one, drove it alongside the green one and directed the others to follow him. His destination was a sand pit in the vicinity of Routes 30 and 83 in Cook County. He had to stop for gas and Smith and Byrd drove on. On the way to the pit, Byrd fired ten intermittent shots, five of them at Latimore's head and five at Alice. Latimore was shot in the ear, the neck, the back and top of his head. Alice was shot in the mouth, ear and chest. Alice was killed, but, miraculously, Latimore was not.

The green car came to a stop at the sand pit a few minutes after the last shot was fired. When the other car drove up Jones came over to the green car and Smith told him, "They are dead. He shot them both, shot them both five times." Jones looked in and said, "They are dead." Latimore feigned death. Someone loosened his hands and felt his pulse and put a hand to his face. Satisfied that the Latimores were dead, the murderers left them in the green car and drove away in the gold one. Latimore stayed on the floor a few more minutes before crawling out of the car.

A man who worked at the pit and lived adjacent to it was awakened about midnight by the barking of a dog and the opening and closing of car doors. He looked out of his bedroom window and saw two Cadillacs and people going back and forth between them. When one drove away, he went to investigate. He looked through the window of the remaining Cadillac and saw one person on the back seat and one on the back floor. He returned to his home and called the State police. When a State trooper arrived there was only one body in the car.

Latimore did not know that his daughter had died. He was able to get out of the car and when he saw her slumped over and bleeding from her mouth he went for help. His own face was covered with blood and he felt weak but he managed to reach two homes where he knocked on the doors and windows but received no response. He then walked along the road, hiding in a ditch when cars came along for fear that Jones, Smith and the stranger might be coming back. He finally reached an open food store. The sheriff's police came in response to a telephone call and an ambulance took him to a hospital.

Nancy Smith and Gus Jones were arrested on July 26 and Byrd two weeks later on August 9. The rings and the watch taken from Latimore were recovered; the $700 that he had on his person and $5,000 that he had in a brown paper bag in his home (and which he thought he saw in the auto under the front seat on the passenger's side while he was lying on the back floor) were not recovered. It was the State's theory that Byrd was a hired assassin and that this money, or some of it, was used to pay him.

Byrd did not testify at his trial and offered no explanation of his whereabouts on the night of July 25. His contention that the State did not prove him guilty beyond a reasonable doubt rests on Latimore's identification, which Byrd claims was vague, uncertain and contradictory.

The crimes were investigated by the Illinois State police and the Cook County sheriff's police. Latimore gave four statements to the police, two in the emergency room of the hospital to which he was taken, and a written one the morning of the same day and another one the following day at the sheriff's police station in Homewood. To the officer who first questioned him in the emergency room, he described the third participant in the crimes as being about 6 feet, 2 inches, dark and with a natural hair style. To the second officer, he described him as around 6 feet tall, in his twenties, dark and having a natural. Latimore left the hospital the early morning of July 26 without being discharged. He told the officers who first questioned him at the Homewood station that the man who shot him was about 5 feet, 10 inches tall, weighed about 175 pounds, was a dark, male Negro, and that he did not know if his hair style was "natural or process." His last statement, made on July 27th, described the man as a "male Negro about five feet eight, about 170 pounds."

In the course of their investigation the police obtained a picture of Byrd taken in 1969—two years before the July 25 crimes. They showed this picture, and those of four or five other individuals having physical characteristics similar to Byrd's, to Latimore. He said the picture of Byrd looked like the man, but he wasn't sure because the picture was of a younger man.

Latimore was unable to recall whether the unknown assailant had worn glasses, but he believed he had not. Byrd, who wore glasses at the trial, was not wearing glasses at the time of his arrest and did not have any on at the lineup. An optometrist testified that he prescribed glasses for Byrd in 1969; that Byrd was myopic and was unable to see the size, shape or color of objects beyond a few feet.

The variations in the height given by Latimore, his uncertainty about the 1969 picture and his lack of recollection about the glasses form the principal basis for the contention that Latimore's identification was neither positive nor credible. The testimony of one witness is sufficient to support a conviction if the witness' identification of the accused is both positive and credible. The credibility of the identification and the weight to be given the witness' testimony are for the jury to decide. Its judgment will be set aside on review only if it is based on evidence which raises a reasonable doubt of the defendant's guilt. *People v. Henderson* (1976), 39 Ill. App. 3d 164, 351 N.E.2d 225.

■■ In the words of the defendant's trial attorney, "Clarence Latimore [had] undergone a frightening experience." He was questioned by

different officers at times when he was in pain and under distress. After having been shot several times in the head and neck, he was interrogated after being in the hospital only five minutes. He had not been informed of his daughter's death and his chief concern was her well being. He kept asking about her—trying to find out how she was. He left the hospital in the early morning of the same night he had entered without being discharged. He went to his home to look for the brown paper bag and then went to the Homewood station. He attributed the description in his second statement to his physical condition. The six inch variation in describing the height of the man, the five pound difference in his weight and the one-time remark that he did not know if the man was wearing his hair natural or processed, do not destroy Latimore's identification. It is understandingly difficult for untrained people to give another person's exact height and weight; and it is to be expected that an individual's estimates of both may vary if he is questioned at different times under trying and difficult conditions. The discrepancies in Latimore's descriptions would affect the weight of his testimony, not necessarily his credibility. We do not think that these discrepancies were so great or so inexplicable that they would offset his positive identification of Byrd as the third person who took part in the crimes.

■■ Nor do we think that his hesitation in asserting that one of the photographs was of Byrd, or his belief that Byrd was not wearing glasses weaken his testimony or raise a reasonable doubt that Byrd was the third participant. Rather, his caution in identifying the picture taken when Byrd was younger, even though he thought it was the same person, speaks for his carefulness and commends his responsibility. Byrd may have required glasses as his optometrist said, but that doesn't mean that he wore them the night of the crimes. He wore them throughout his trial, but he had none on when he was arrested and wore none when he appeared in a lineup.

Latimore saw the third person for at least ten minutes in the lighted bedroom. During this time Latimore was standing up and the man held a gun in the midsection of his body. Latimore looked at him again while he was lying on the floor. He glanced up twice; the first time he raised his eyes only as far as the man's stomach before he was struck in the head with a gun; the second time he looked right into the man's face. He saw him again in the lighted garage. Five days later he tentatively selected Byrd's picture from among those shown him. Several days after this he pointed out Byrd in a lineup composed of four men, all of approximately the same height, weight and age and all with the same hair style. At Byrd's trial he swore that Byrd was the man who shot him and his daughter. His positive and unshaken identification was sufficient to support Byrd's conviction. Byrd was proved guilty beyond all reasonable doubt.

The picture about which we have been speaking—a police photograph of Byrd—gives rise to one of the defendant's contentions. He claims that the trial court erred in admitting it into evidence and then erred again in permitting it to be taken into the jury room. The central issue at the trial was the accuracy of the defendant's identification. His counsel attempted to cast doubt upon this identification in every way he could. One of the ways he tried to do so was to show that Latimore hesitated when first shown the picture. Latimore's explanation for the hesitation was that there was a difference between Byrd's appearance in the 1969 picture and his appearance at the time of the crimes and at the trial. Whether this was so became an issue at the trial. Its importance was emphasized in the final arguments of both sides. Byrd's attorney told the jurors:

"You know what he looked like in 1969 as there is a picture here, and you will be able to look at that and ask yourself is there such a substantial difference between a person depicted on those two pictures that you can say a man who was not sure on the 30th of July suddenly was sure two weeks later?"

Similarly, the prosecutor in his closing remarks asked the jury to compare the photograph of Byrd with the photograph of the lineup, which was also before it, and decide whether Byrd did actually look younger in the photograph than he did when arrested.

■■ The primary conditions for the admissibility of a photograph are those of relevancy and accuracy. (*People v. Donaldson* (1962), 24 Ill. 2d 315, 181 N.E.2d 131.) A police photograph is admissible to show the reasonableness of a witness' identification that the offender and the person depicted are the same. It is not admissible simply to prejudice the jurors by suggesting to them that the defendant has a prior criminal record. (*People v. Maffioli* (1950), 406 Ill. 315, 94 N.E.2d 191; *People v. Adams* (1974), 22 Ill. App. 3d 665, 318 N.E.2d 278.) Here the issue was whether Latimore's failure to quickly and positively identify Byrd as the third assailant from the 2-year-old photograph destroyed or injured the credibility of his later lineup and in-court identifications. The photograph was relevant to this issue and the court correctly received it in evidence. And given the importance of the issue which confronted the jury, the court ruled correctly in allowing it to view the photograph.

The picture showed Byrd with a plaque hanging from a chain around his neck which carried a number and the date July 22, 1969. Byrd argues that even if the picture was correctly received in evidence it should not have been allowed in the jury room. Before ruling that it could be seen by the jury, the trial court ordered that the date and the prior identification number be blocked out. This was done to the court's satisfaction. Even if it had not been done, it is difficult to see how the defendant would have been prejudiced in view of his own attorney's description of the picture

during his cross-examination of Latimore. He asked Latimore if the pictures that had been shown him were "mugshots":

"Attorney: And were they mugshots, when I say 'mugshots' side view, front view?

Latimore: Yes.

Attorney: Plate on his chest with a number?

Latimore: Yes."

Byrd was not prejudiced by the jury seeing the picture.

The defendant protested the testimony by the investigating officers concerning the steps they took to effect his arrest. Investigator Clarence Buckendahl of the sheriff's police force testified that he arrested Nancy Smith at 4 o'clock in the morning on July 26—four hours after the Latimores had been abandoned in the sand pit. Investigator William Martin of the sheriff's police arrested Gus Jones in the afternoon of the same day. The officers questioned the suspects and had them retrace their route from Latimore's home to the pit. After interviewing them, Martin went to the area of 47th Street and Drexel Boulevard, Chicago, looking for particular individuals. He received a telephone call from Buckendahl at 2 a.m. the next day, July 27. He then went to the Bureau of Vital Statistics in Chicago's Civic Center. While conducting his investigation he obtained five or six photographs. He showed these to Latimore on July 30, and showed one of them to Smith and Jones. He also visited a United States post office on the south side of Chicago and talked to postal employees. After completing his investigation which took 14 days, he and two other officers went to an address on South Union Avenue, Chicago. He deployed one officer to the rear of the building and he and the other one went to the front door. A woman answered, but after talking to them two or three minutes she suddenly slammed the door in their faces. They heard a commotion at the rear of the house, ran there and found that the officer stationed at the back of the house had David Byrd under arrest. That officer had seen Byrd come out of the building with a pair of shoes in his hand. When he bent down to put them on, the officer went up to him, identified himself and took Byrd into custody.

■■ Informing the triers of fact of consequential steps in the investigation of a crime is normal procedure and is important to the full presentation of the State's case. The State must be permitted to make some explanation why a previously unidentified defendant was arrested and shown to the victim of a crime. If this were not permitted defense counsel could play upon it in argument, asking why the defendant—of all the men in the world—was on trial, insinuating that the accused was arrested without reason.

When a police officer testifies that after talking to certain people he arrested the defendant, an unavoidable implication, justified or

unjustified, arises that these people gave him information that led to the defendant's arrest. The potential harm to the defendant in permitting this testimony must be weighed against the damage to the State if it is not allowed. Usually a balance is struck that is reasonably fair to both parties: the State is permitted to disclose some but not all of the investigatory process; excluded are those disclosures that are patent subterfuges for impermissible hearsay.

Byrd agrees that the officers' testimony was not hearsay in the traditional sense—repetition of an out-of-court statement to prove the truth of the matter asserted in the statement—but he claims that the testimony prejudiced his right to a fair trial because the chain of evidence established by the prosecution implied what it could not prove directly, that Smith or Jones, or both of them, named Byrd as their accomplice. *Cf. People v. Allen* (1976), 36 Ill. App. 3d 821, 344 N.E.2d 825.

■■ Whether this type of evidence is-admissible has previously been considered. In *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537, it was held there was no reversible error where a policeman testified that he had a conversation with the defendant's accomplice and told a detective to go to a certain locality, presumably where the defendant could be found. The reviewing court recognized the obvious—that the accomplice had made a statement incriminating the defendant—but found 'no reversible error. The court stated that there was no violation of the Confrontation Clause of the Federal Constitution because the trials of the defendant and his accomplice had been severed and because there was no showing that the State had hindered the defendant from bringing the accomplice into court for cross-examination. *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. Likewise, there is nothing in the present record which indicates that the State prevented Byrd from calling Smith, or Jones who had already been convicted (*People v. Jones* (1973), 16 Ill. App. 3d 738, 306 N.E.2d 509, *leave to appeal denied*, 56 Ill. 2d 584 (1974)), and subjecting them to cross-examination.

The *Wright* court also briefly considered the policeman's testimony against the rule pertaining to the nonadmissibility of hearsay evidence and found no objection on this ground. The hearsay problem was likewise addressed in *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364, where it was held that an officer may testify that he had a conversation with a certain party and that thereafter he arrested the defendant. The court said: "both the fact of the conversation and his [the officer's] subsequent conduct were within his personal knowledge and competent as testimony of the officer's investigatory procedure." See also, to the same effect, *People v. Wedge* (1943), 383 Ill. 217, 48 N.E.2d 943; *People v. Sanders* (1976), 37 Ill. App. 3d 236, 345 N.E.2d 757.

■■ In the present case there was no hearsay evidence and the damage to Byrd, if any, from the officer's testimony was minimal. The trial court ruled that the officers could, for the most part, testify to what they did, but could not relate the conversations they had, even what they themselves said to anyone else. In addition to the exclusion of all conversation and certain questionable investigatory activity, the link connecting the interview with Smith and Jones to Byrd's arrest was not direct. His arrest did not follow immediately after the investigators talked to Smith and Jones; several intermediate steps were taken by them and two weeks elapsed before he was taken into custody. The complete investigation—which the jury did not hear—was long and complicated. The officers were only informed of Byrd's nickname; excellent police work culminated in his apprehension.

The judgment is affirmed.

Affirmed.

MEJDA, P. J., and McNAMARA, J., concur.