# Illinois Official Reports

## Appellate Court

---

### *People v. Thompson*, 2014 IL App (5th) 120079

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEREMY R. THOMPSON, Defendant-Appellant. |
| | |
| District & No. | Fifth District<br>Docket No. 5-12-0079 |
| | |
| Filed<br>Modified upon<br>denial of rehearing | April 25, 2014<br><br>November 18, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for illegal procurement of anhydrous ammonia and tampering with equipment in violation of the Methamphetamine Control and Community Protection Act based on the identification testimony of several witnesses, including police officers, arising from a surveillance video and a still image derived from the video were reversed and the cause was remanded, since the prosecution failed to follow the Illinois Appellate Court's decision in *Starks*, which sets forth the standards for the admission of such identification testimony, most of the witnesses had had prior dealings with defendant, the testimony about the video camera was improper to the extent that it described how the camera was installed with the intention of capturing a thief, and in the end, the jury was invited to base its verdict on the propriety of the investigation, rather than the adequacy of the proof of the crime. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Hamilton County, No. 11-CF-50; the Hon. David K. Frankland, Judge, presiding. |
| | |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Ellen J. Curry, and Lawrence J. O'Neill, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Justin Hood, State's Attorney, of McLeansboro (Patrick Delfino, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Justices Spomer and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Jeremy R. Thompson, was charged in the circuit court of Hamilton County with illegal procurement of anhydrous ammonia and tampering with equipment in violation of the Methamphetamine Control and Community Protection Act (720 ILCS 646/25 (West 2010)). After trial, a jury found defendant guilty on both counts and the court entered judgment on the verdict. On appeal, defendant raises issues as to whether he was denied a fair trial by the trial court admitting lay opinion testimony identifying him from surveillance recordings.

¶ 2    We reverse and remand.

¶ 3                                FACTS

¶ 4    Prior to trial, defendant filed a motion *in limine* regarding the admissibility of witness opinions. Defendant asserted that the State's anticipated use of witnesses to testify that they believed defendant was shown on surveillance recordings would be an opinion as to ultimate fact that would invade the province of the jury. The trial court denied the motion.

¶ 5                         Deputy Jason Stewart

¶ 6    At trial, the first witness called by the State was Deputy Jason Stewart of the Hamilton County sheriff's department. Deputy Stewart described how anhydrous ammonia was used in the production of methamphetamine and how it was often stolen from local farm supplies. In June 2011, Deputy Stewart personally oversaw the installation and maintenance of a surveillance camera at Hamson Ag in Dahlgren.

¶ 7    On the morning of July 21, 2011, Deputy Stewart was dispatched to Hamson Ag. Upon seeing that three tanks had their caps removed, Deputy Stewart reviewed and copied recordings made by a surveillance camera trained on the tanks in case of theft. The sensor for the camera was initially tripped at 6:26 a.m. Deputy Stewart described the actions of a white male in the surveillance video. Deputy Stewart described the physical appearance of the man

with a bald spot, large forehead, and receding hairline, wearing a gray cut-off tee shirt and baggy pants. Stewart described how the man was carrying a five-gallon bucket and a green soda bottle with a clear hose attached. Stewart testified that, based on his training and experience, a soda bottle attached to a hose is commonly used to steal anhydrous ammonia.

¶ 8      Deputy Stewart did not recognize the white male, but he circulated the video through his department and gave a copy to Chief Deputy Will Sandusky, a member of the Illinois State Police Drug Task Force, to distribute throughout other counties and agencies.

¶ 9                                   Officer Brian Huff

¶ 10      Officer Brian Huff of the Mt. Vernon police department saw a still image derived from the surveillance video at the roll call table. Over defendant's objection, Huff stated that he recognized the person in the image as defendant and identified defendant in the courtroom. Huff agreed with the prosecutor that the image was somewhat blurry, but Huff recognized defendant because he "had previous dealings with him." Huff testified that in the background there were anhydrous ammonia tanks and a bucket and a tube typically used to procure anhydrous. Huff notified his supervisor that he recognized the person in the video as defendant.

¶ 11                                Officer Kevin Jackson

¶ 12      Officer Kevin Jackson of the narcotics division of the Mt. Vernon police department testified that he assisted the Hamilton County sheriff's department on the case. Jackson stated Hamilton County had provided a video to his supervisor, who then circulated a still-image photo to the patrol division. When asked to describe the still image as an exhibit, Jackson stated that it was defendant carrying a five-gallon bucket with a plastic tube attached to what looked like a soda bottle.

¶ 13      When asked if he was able to identify who was depicted when the still image was first shown to him, Officer Jackson responded: "At the time, no. I knew it resembled [defendant], but the video–the picture that I had was a black and white picture. And it had been–looked like it had been Xeroxed or faxed." When asked if he was able to subsequently determine who was depicted, Officer Jackson replied that after looking at the video, he was "able to positively identify the person to be [defendant]." Over defendant's objection, Officer Jackson identified defendant in open court. On cross-examination, Jackson testified that he had not viewed the video until a week before trial.

¶ 14                                  Jessica Joslin

¶ 15      Officer Jackson stated that within a week of receiving the still image, he showed it to Jessica Joslin. Apparently, Officer Jackson showed Joslin a color copy of the distilled image Officer Huff reviewed at the roll call table. Both copies of the distilled image were submitted to the jury as exhibits. Joslin testified that when Jackson showed her the still image, she believed it was a person she knew by the name "Jeremy." Joslin stated she had never carried on a conversation with "Jeremy," but had "seen him sleeping on a front porch one time." On cross-examination, Joslin admitted that when she saw "Jeremy," she herself was strung out on methamphetamine. Joslin also admitted that her husband had charges pending against him

for tampering with anhydrous ammonia.

¶ 16                            Chief Deputy Will Sandusky

¶ 17    On August 17, 2011, Chief Deputy Sandusky interviewed defendant. Before addressing his interview of defendant, Sandusky was asked about his initial involvement with the case and whether he witnessed a video. Sandusky testified that he watched the recording, but "did not immediately recognize the subject in the video." Sandusky testified that he began his interview by telling defendant that "he had been caught on surveillance stealing anhydrous ammonia." Sandusky then described the importance of a printout of a still image from the surveillance video:

> "Q. [Attorney for State:] Okay. And why was this photo significant to [defendant] after you told him that you had reportedly caught him on video?
>
> A. After I informed [defendant] that he had been caught on surveillance video, he asked that he could–wanted to know if he could see the evidence. I showed him the still image. And he looked at it for several seconds and said, I wish this wasn't me–or I wish I could say this wasn't me. But it is."

¶ 18    Defendant also stated that the photo was "pretty cool" and wanted a copy. According to Sandusky, defendant admitted that he had been manufacturing methamphetamine for several months and had stolen approximately two gallons of anhydrous ammonia from Hamson Ag on four or five different occasions. Sandusky stated that as they were leaving the interview room, defendant stated that it was not really him in the video as he had been in custody in Johnson County. Sandusky stated that his inquiry revealed that defendant had been released from custody in Johnson County on July 18.

¶ 19    As part of closing argument, the prosecution stated: "You saw the photograph of the defendant. You had several officers identify the defendant that had prior dealings with him."

¶ 20    The jury returned a verdict of guilty on both counts. The court entered judgment on the verdict and defendant was sentenced to 18 years' imprisonment. Defendant appeals.

¶ 21                                   ANALYSIS
¶ 22                            I. Identification Testimony
¶ 23    At trial, several police officers and an apparent informant testified that defendant was the one pictured in surveillance. The State contends that this testimony was an appropriate lay opinion on identity. Considered separately, none of the witnesses met the standards for identification testimony. None of these witnesses aided the jurors' own identification of who was depicted in the surveillance. Considered collectively, the identification testimony encroached on the function of the jury to such an extent that no confidence can rest in the verdict.

¶ 24    Illinois has long allowed identification testimony by witnesses who did not personally observe events depicted in a video recording. *People v. Starks*, 119 Ill. App. 3d 21, 25, 456 N.E.2d 262, 265 (1983); see *People v. Owens*, 394 Ill. App. 3d 147, 154, 914 N.E.2d 1280, 1286 (2009); *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 35, 972 N.E.2d 1272. In establishing the standard for admission of such testimony, Illinois looked to the Federal Rules of Evidence and procedures adopted by other jurisdictions. *Starks*, 119 Ill. App. 3d at 25, 456 N.E.2d at 265; Fed. R. Evid. 701 (eff. Jan. 1, 2011). Subsequently, Illinois adopted

its own rules. The procedure for evaluating identification testimony first established by *Starks* is consistent with Illinois Rule of Evidence 701. Ill. R. Evid. 701 (eff. Jan. 1, 2011) (opinion testimony by lay witnesses); see also Ill. R. Evid. 704 (eff. Jan. 1, 2011) (opinion on ultimate issue). *Starks* provides the framework for our decision.

¶ 25　　　In *Starks*, two inmates were convicted of felonies after participating in a prison riot. Cameras monitored the area where the riot occurred. At trial, correctional officers identified the defendants as among those shown on the video. *Starks*, 119 Ill. App. 3d at 24, 456 N.E.2d at 264.

¶ 26　　　*Starks* rejected the claim that the guards rendered expert opinions. *Starks* first looked to federal cases interpreting Federal Rule of Evidence 701. *Starks* noted that federal courts had found identification testimony met the standards of Rule 701 when the defendant's appearance had changed between the offense and the trial. *Starks*, 119 Ill. App. 3d at 25, 456 N.E.2d at 265. The federal courts had concluded that the admission of such testimony was not an error of constitutional dimensions. *Starks*, 119 Ill. App. 3d at 25, 456 N.E.2d at 265 (citing *United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976), and *United States v. Butcher*, 557 F.2d 666 (9th Cir. 1977)). *Starks* then looked to the California courts. In California, identification testimony had been seen as an appropriate aid to the trier of fact in instances where the surveillance did not render a clear depiction. *Starks*, 119 Ill. App. 3d at 25-26, 456 N.E.2d at 265 (quoting *People v. Mixon*, 180 Cal. Rptr. 772 (Cal. Ct. App. 1982) (nose, chin, and cheek betrayed identity despite cap being pulled below ears), and citing *People v. Perry*, 131 Cal. Rptr. 629 (Cal. Ct. App. 1976) (defendant shaved mustache)).

¶ 27　　　*Starks* found that the guards' testimony was a proper aid for explaining an unclear depiction. It noted that the record did not indicate the defendants had changed appearances before trial. *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 265-66 (citing *United States v. Jackson*, 688 F.2d 1121, 1126 (7th Cir. 1982) ("defendant did, in fact, alter his appearance somewhat, by cutting his hair and shaving his mustache, during the brief period of just over one month")). Nonetheless, *Starks* noted that the surveillance was in the form of a video, and not just a photograph, and that the identified subjects were in the background of the surveillance. *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 266; see also *United States v. White*, 639 F.3d 331, 336 (7th Cir. 2011) (surveillance video was not of best quality and perpetrator was concealed by his attire). *Starks* concluded that the guards' testimony was a proper aid to the jury because they were more "familiar with the defendants' mannerisms and body movements." *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 266.

¶ 28　　　If *Starks* is read as a set of instructions on how to develop identification testimony, the prosecution failed to follow these instructions. *Starks* allows a witness familiar with a defendant to aid the jury if the offering party can demonstrate how the witness was better able to discern who was depicted in the surveillance. See Ill. R. Evid. 701 (eff. Jan. 1, 2011) (opinion testimony by lay witnesses). The record here contains no such foundation. The identification testimony consists of bare conclusions. None of the witnesses suggested how they were better able than the jury to discern who was depicted. None testified that defendant's appearance had changed. None testified that they identified defendant's mannerisms, clothing, or body language. Nor can this court glean from the record any reason why any of these witnesses were better able than the jury to identify who was depicted in the video.

¶ 29        For appellate review, *Starks* establishes a two-part test. *Starks*, 119 Ill. App. 3d at 25, 456 N.E.2d at 265; see *People v. Owens*, 394 Ill. App. 3d 147, 154, 914 N.E.2d 1280, 1286 (2009); *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 35, 972 N.E.2d 1272. First, the witness must have been familiar with the defendant prior to the offense. *Starks*, 119 Ill. App. 3d at 25, 456 N.E.2d at 265. Second, the testimony must aid in resolving the issue of identification without invading the duties of the trier of fact. In discussing how testimony could be a proper aid in identification without invading the province of the fact finder, *Starks* discussed two types of situations. *Starks*, 119 Ill. App. 3d at 25, 456 N.E.2d at 265. The first type of situation is where a defendant's appearance has changed between the time of the recording and date of trial. The second category is where the video is an unclear or limited depiction.

¶ 30        *Starks*' interpretation of the Federal Rules of Evidence is consistent with the subsequently enacted Illinois rules. Illinois Rule of Evidence 701 allows a lay opinion if it is based on a witness's perception and is helpful to a determination of a fact in issue without invading the province of the jury. Ill. R. Evid. 701 (eff. Jan. 1, 2011). Similarly, Rule 704 has been interpreted to permit opinion testimony on an ultimate issue only in instances where it is of assistance to the trier of fact. Ill. R. Evid. 704 (eff. Jan. 1, 2011); *Sykes*, 2012 IL App (4th) 111110, ¶ 35, 972 N.E.2d 1272. In other words, Rule 704 " 'excludes opinion testimony of a lay witness "wherever inferences and conclusions can be drawn by the jury as well as by the witness ***." ' " *Sykes*, 2012 IL App (4th) 111110, ¶ 36, 972 N.E.2d 1272 (quoting *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 221, 483 N.E.2d 524, 526 (1985), quoting 7 John H. Wigmore, Evidence § 1917, at 10 (Chadbourn rev. ed. 1978)).

¶ 31        *Starks* answers the focus of the briefs on appeal. At trial, four witnesses identified defendant as the person depicted in surveillance. The primary justification for admission asserted by the State is that this testimony is a direct aid to identification.

¶ 32        Each witness met the first test of *Starks* by being familiar with the defendant prior to the offense. These witnesses either directly testified to prior dealings with defendant or indirectly insinuated familiarity.

¶ 33        Nonetheless, none of the witnesses fit in either of the categories laid out in the second step of *Starks*. None of the witnesses had a better perspective than the jury to interpret the surveillance. None of the witnesses even alluded to the first category of defendant's appearance having changed before trial. The State's assertion of such a change of appearance is not documented by the record and is purely speculative.

¶ 34        This leaves the type of situation exemplified by *Starks*. In *Starks*, the testimony served the utility of helping describe an unclear depiction. *Starks* concluded the guards were in a better position to compare the prisoners to the body language of the persons depicted in the background of the video. *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 266. *Starks* informs courts to evaluate each witness according to the form of recording they are deciphering in front of the jury. In this case, the jury and witnesses were presented with two different depictions–a still image derived from the video and the video itself.

¶ 35        The record substantiates the premise that the still image was an unclear depiction. Officer Huff testified that the still image was "somewhat blurry," but the most exacting testimony on the clarity of the still image came from Officer Jackson. Officer Jackson, however, did not identify defendant from a still image. Officer Jackson testified that he thought the character in the black-and-white still picture that was apparently faxed to his department resembled

defendant, but when he looked at the video the week before trial, he was able to positively identify defendant.

¶ 36    Two witnesses identified defendant to the jury off a still image. Despite the presentation of the video to the jury, both Joslin and Officer Huff stated they recognized defendant in a distilled still image.

¶ 37    Under *Starks*, their identification testimony would have been of questionable value even if the still image had been the only recording available to the jury. *Starks* views photographs and videos differently. *Starks* illustrated how an unclear depiction in a video revealed body language and mannerisms familiar to the witnesses, but suggested that no such information could be gleaned from a still photograph. *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 266. None of the witnesses described any particular features or aspects of defendant that would serve the demands for a proper aid to interpreting an unclear depiction. Indeed, any claim that either Joslin or Officer Huff recognized defendant from his body language or mannerisms is belied by their identification off a still image.

¶ 38    In any event, the jury was able to compare both the video and the distilled image against defendant who was present in court. There is no reason to assume that Joslin or Officer Huff could make a more informed assessment of who was depicted in the surveillance than the jury itself. Indeed, as the jury had the original moving video in front of it, the jurors were in a position superior to these two witnesses.

¶ 39    The record strongly argues that the video was a clear depiction that the jury would need no help in deciphering. Unlike *Starks*, nothing indicates that the suspect was in the background of the video or the depiction is unclear. Nor is this a case in which an uncertain depiction can be imputed from a silent record. The record speaks to the clarity of the depiction. Foundation for the video was laid through the testimony of Deputy Stewart. Deputy Stewart described how the camera was installed with an eye on capturing images of a thief. Deputy Stewart left no doubt that the video captured the suspect in exacting detail, from the suspect's gray cut-off tee shirt and baggy pants up to his bald spot and large forehead.

¶ 40    Applying *Starks*, the testimony interpreting the identity of who was depicted in the video was improper. Again, *Starks* would allow witnesses to identify a defendant from a recorded image if his appearance had changed or the image was unclear. *Starks* found that in such instances, the identifications were an aid to the jury. On the other hand, if the standards of *Starks* are not met, such an opinion would serve no utility and the province of the jury is invaded. *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 266.

¶ 41    Nonetheless, two additional law enforcement officials informed the jury that they recognized defendant in the video. Officer Jackson directly declared his personal conviction that defendant was the person depicted in the video. His testimony, as with the other witnesses, does not reveal how he came to his conclusion, nor did he describe any particular feature of defendant that he discerned. Moreover, Officer Jackson's testimony as a whole counters any claim that the video presented an unclear depiction to the jury. Despite the lack of any expressed discernment, Officer Jackson testified the clarity of the video was superior to that of the "Xeroxed or faxed" still image. In the end, Officer Jackson did not view the video until one week before his testimony, after defendant had been identified as a suspect and in apparent anticipation of trial. This testimony relayed Officer Jackson's comfort with

viewing defendant as a suspect, but nothing indicates that he had a better perspective to identify who was in the video than the jurors.

¶ 42    One other witness alluded to his personal recognition of defendant in the video. Similar to Officer Jackson, Chief Deputy Sandusky did not reach a conclusion about the surveilled individual until after defendant was identified as a suspect. Sandusky was asked if he had the opportunity to "witness a video" in the days after the offense. Instead of testifying that he contacted other departments because he did not know who was depicted, Sandusky responded that he "did not immediately recognize the subject in the video." This lack of immediate recognition implies an ultimate recognition. Furthermore, given the context of the prior familiarity of other law enforcement officers, Chief Deputy Sandusky's ultimate recognition alludes to a prior acquaintance with defendant.

¶ 43    In closing argument, the prosecution asserted that "several officers" had identified defendant from their prior dealings. Although defendant points out the prosecutor's closing comment, on appeal defendant does not argue directly to Chief Deputy Sandusky's insinuated opinion. Still, Sandusky's comment indicated that he was one of the several officers who had prior dealings with defendant. Likewise, Chief Deputy Sandusky's testimony bolstered a string of witnesses who identified the person in the surveillance as defendant, despite none of these witnesses being in a better position to interpret the video than the jurors. This court cannot ignore the insinuated interpretation of the video nor the allusion to defendant's character.

¶ 44    The record strongly suggests that the trial court never considered whether any of the witnesses met the second part of *Starks*. This leads to the more plausible explanation for the trial court's allowance of this unduly prejudicial testimony–the testimony was directed at police procedure. Unfortunately, the record does not justify the cumulative testimony.

¶ 45                                II. Police Procedure

¶ 46    In general, the consequential steps of an investigation are relevant to explaining the State's case to a jury. *People v. Johnson*, 116 Ill. 2d 13, 24, 506 N.E.2d 563, 568 (1987). In particular, the State must be allowed to explain why a previously unidentified defendant became a suspect. *People v. Byrd*, 43 Ill. App. 3d 735, 742, 357 N.E.2d 174, 179 (1976). Silence as to this point would leave open the question of why, of all the people in the world, the police arrested defendant. *People v. Gonzalez*, 379 Ill. App. 3d 941, 950, 884 N.E.2d 228, 236 (2008). This would invite speculation and baseless innuendo that the investigation lacked rigor. *Byrd*, 43 Ill. App. 3d at 742, 357 N.E.2d at 179.

¶ 47    The record presents a series of dots that suggests a timeline for the investigation. Officer Huff informed his supervisors that he believed defendant was depicted in the surveillance. Thus, Officer Huff's testimony was relevant to explaining the investigation and was permissible in order to counter any claim by defendant that he was unfairly considered a suspect.

¶ 48    Joslin, an apparent informant, also identified defendant before he was brought in for an interview. If the only other witness identifying defendant had been Joslin, the admission of her testimony would have been questionable. The relevance of her role in the investigation appears limited in light of Officer Huff's already making defendant a suspect. In contrast, the potential for prejudice from presenting her identification testimony was greater because of its

cumulative nature. Moreover, her apparent status as an informant alludes to the social circles occupied by defendant. Although this determination would have rested in the discretion of the trial court, the record gives no indication that her relevance to the investigation or the potential for prejudice was weighed. In any event, a scenario in which both Joslin and Officer Huff, and only the two of them, identified defendant is merely hypothetical.

¶ 49    The State presented a parade of law enforcement officers identifying defendant as the one depicted in the surveillance. After Officer Huff and Joslin had identified defendant as a suspect, Officer Jackson and Chief Deputy Sandusky came to believe the image in the video was defendant. Their review of the video displayed a comfort level with proceeding with the investigation. However, this testimony does not explain how defendant became a suspect. Defendant had already been identified as the suspect by the time either of these officers made the identification they relayed to the jury. See, *cf.*, *Byrd*, 43 Ill. App. 3d at 742, 357 N.E.2d at 179. Relaying Officer Jackson's and Chief Deputy Sandusky's comfort with proceeding with the investigation after viewing the video did not assist the jury's understanding of the steps of the investigation or how defendant became the suspect. Instead, this simply conveyed the officers' personal opinions. The personal convictions of these officers were irrelevant and highly prejudicial.

¶ 50                                    III. The Province of the Jury

¶ 51    Even if each witness had offered a proper lay opinion, offering cumulative identification testimony would have run the risk of prejudice. Under any circumstance, having several witnesses interpret a video runs the risk of supplanting the function of the jury. *Starks* recognized this potential. *Starks* cautioned: "Trial judges should limit the amount of such cumulative evidence." *Starks*, 119 Ill. App. 3d at 27, 456 N.E.2d at 266.

¶ 52    In this case, the identifications painted multiple layers of prejudice on the images presented to the jury. On one level, by meeting the first test of *Starks* and establishing a prior familiarity with defendant, the law enforcement officers and apparent informant insinuated defendant was a dissolute character. On another level, by failing to satisfy the second test of *Starks*, each of these witnesses invaded the province of the jury. Repeating these bare conclusions as to who was depicted in the surveillance compounded the error and leaves this court with no confidence that the jury based the verdict on its own unfiltered interpretation of the evidence.

¶ 53    The first layer of prejudice, stemming from defendant's familiarity to law enforcement officials, was not present in *Starks*. *Starks* began by noting that the jury was already fully aware that the prisoners were convicted criminals. *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 265. Thus, *Starks* did not have to weigh otherwise instructive testimony against this risk of prejudice.

¶ 54    In contrast, the witnesses in this case conveyed a prejudicial message about defendant's character to the jury. The mere suggestion of prior police acquaintance is susceptible to prejudicial implication. *People v. Eghan*, 344 Ill. App. 3d 301, 313, 799 N.E.2d 1026, 1036 (2003) (officers called the defendant by first name during arrest); *People v. Bryant*, 113 Ill. 2d 497, 514, 499 N.E.2d 413, 421 (1986) (improper to elicit testimony that a police officer yelled the defendant's name in pursuit). Moreover, the context of comments can indicate that a defendant had issues with substance abuse. See *People v. Carter*, 297 Ill. App. 3d 1028,

1035-36, 697 N.E.2d 895, 900 (1998) (plain error when two narcotics officers allude to familiarity with the defendant).

¶ 55　　This is not a case where the insinuation is vague or the impact miniscule. See, *e.g.*, *People v. Adkins*, 239 Ill. 2d 1, 28-29, 940 N.E.2d 11, 27-28 (2010) (impact of police recognition miniscule as the defendant relied on his status as skilled burglar for defense against charge of murder). In this case, the implication of defendant's bad character was repeated and, at times, direct. Three law enforcement officers insinuated that they were familiar with defendant, with Officer Huff going so far as to say he had "previous dealings" with defendant. This was in addition to the hazy cloud of drug use implied by the informant Joslin.

¶ 56　　The most cogent reading of the record suggests no underhanded, improper motive on the part of the prosecution. Nonetheless, the prejudice of having not one, but several, law enforcement officers and an apparent informant allude to their prior dealings with a person charged with a drug-related theft is unmistakable and profound.

¶ 57　　The prejudice, however, is not limited to a disparagement of defendant's character. Although no one was in a better position to interpret who was in the video than the jurors, the good character of the officers was placed before the jury. This mixed their functions as officers with their role as witnesses. Naturally, after defendant was under investigation, these officers would have asked themselves if they believed it was defendant in the video. This is certainly good police work, but undoubtedly their subjective beliefs during the course of investigation were not an aid to identification at trial, as required by *Starks*, nor to explaining the consequential steps of their work, as allowed by *Byrd*.

¶ 58　　The inherent unreliability of the verdict stems from the error of conducting the trial as a display of the subjective aspects of the police investigation. The visual images presented at trial were colored by the unanimous conclusion of witnesses who, though in a position of authority, had no better vantage point than the jury to compare defendant to the video. Although not helpful in explaining the course of the investigation, by introducing these opinions in the context of the investigation, the jury was invited to base its verdict on the propriety of the investigation instead of the adequacy of the proof of the crime. The jurors were faced with more than a challenge of forming their own interpretation of the video; in order to reach a verdict of not guilty, the jurors would have needed to interpret the surveillance contrary to the investigating officers.

¶ 59　　A conviction based upon video surveillance would seem unassailable to doubt. Unfortunately, the parade of witnesses issuing conclusions about who was depicted tainted the jury's interpretation and makes other evidence inconsequential. The State contends that even if the testimony was improper, other evidence supports conviction, including incriminating statements by defendant and physical evidence from the scene. Given the singular role of surveillance, a conviction obtained after several witnesses improperly opined on its contents cannot be trusted. The introduction of these multiple, concurring witnesses pointing to defendant would have erased any reasonable doubt the jurors might otherwise have held. Moreover, the jurors understood that the officers had prior dealings with this suspect. No confidence can be placed in the verdict.

¶ 60　　Mindful of the potential of an overly broad interpretation of this opinion, two related points need to be clarified. First, this opinion should not be read as handcuffing a prosecutor's ability to present witnesses that meet the minimal standards of *Starks*. Again,

the jury was presented with multiple bare conclusions with no indication that any of these witnesses would have been better able to interpret the surveillance than the jurors themselves. The failure of the prosecution to follow the standards of *Starks*, and to do so with numerous witnesses, is likely to be a rare scenario. Second, the reversal of this conviction should not be read as a criticism of the work of the officers. Cumulative identification by police officers might be considered in determining probable cause, but its potential impact on a jury means that its admission at trial should be measured. *People v. Green*, 88 Ill. App. 3d 929, 932, 410 N.E.2d 1003, 1006 (1980) (evidence at hearing on probable cause need not be admissible at trial); see also, *e.g.*, *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 34, 968 N.E.2d 174 (discussing option of laying foundation outside of presence of jury). Absolutely nothing in the record suggests any step in the police investigation was improper. To the contrary, the personal conclusions of the police officers were bound to carry such weight that this court can have no confidence that the jury reached its verdict through its *own* interpretation of the evidence.

¶ 61 Finally, double jeopardy does not bar retrial. Although the verdict was made unreliable by the improper evidence, the reversal does not stem from a finding that the record was otherwise insufficient to sustain a conviction. *People v. Alfaro*, 386 Ill. App. 3d 271, 314, 896 N.E.2d 1077, 1113 (2008). A review of the record indicates that a rational trier of fact could have found the essential elements of the crime absent the error, but this court reaches no conclusions binding on retrial as to guilt. *People v. Lopez*, 229 Ill. 2d 322, 367, 892 N.E.2d 1047, 1073 (2008).

¶ 62 Defendant asserts plain error on other issues that need not be addressed as this court reverses the conviction.

¶ 63 On appeal, the State confesses that convicting defendant of both attempting to procure anhydrous ammonia by tampering with equipment (720 ILCS 646/25(a)(2) (West 2010)) and tampering with anhydrous ammonia equipment (720 ILCS 646/25(d)(2) (West 2010)) was error in that these two charges were based on the same physical act. See *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844 (1977). We agree and are confident such error would not reoccur on remand.

¶ 64 For the reasons stated above, defendant's conviction is reversed and the matter is remanded. In all other respects, the petition for rehearing is denied.

¶ 65 Reversed and remanded.